16000

ANDERSON *ET AL.* v. PURVIS.
(44 S. E. (2d) 611)

256

*Mr. John D. Nock,* of Cheraw, for Appellants, cites:

*Messrs. Samuel Want, James S. Verner* and *Sam Rogol,* of Darlington, for Respondent,

*Mr. John D. Nock,* of Cheraw, for Appellants, in reply. October 24, 1947.

FISHBURNE, J.: This suit was commenced on May 9, 1943, for the foreclosure of a mortgage given by O. H. Purvis to J. L. Anderson, of date November ——, 1927, in the sum of $5,511.09. Anderson died on February 18, 1940, and the foreclosure proceeding was brought by his widow, as his legatee of a one-fifth interest, and his four children, as assignees of a four-fifths interest.

The origin of the debt relates back to 1920, at which time Anderson, in order to enable Purvis (a practicing physician), to erect an office building, furnished him with brick, lumber and cash. This debt was first evidenced by a note given on May 21, 1920, which was secured by a mortgage of the same date covering the office property, and recorded May 17, 1923. On April 12, 1927, at the request of Purvis, Anderson satisfied the mortgage he held on the office building and in place of it accepted the mortgage upon which suit has now been brought, which covers the residence of the defendant.

On January 27, 1931, there was a balancing of accounts between Anderson and Purvis. The indebtedness evidenced

and secured as aforestated was credited with certain sums due Purvis for medical services rendered by him to the employees of Anderson's brick yard and veneer plant. Upon this credit being given, which amounted to $1,285.00, Purvis executed and delivered to Anderson a new note for $5,161.45, representing the balance due on the original indebtedness. This note is secured by the mortgage executed in 1927. At the time this foreclosure suit was brought, the mortgage debt, principal and interest, amounted to $10,813.76.

The defense admits the execution and delivery of the note and mortgage and the amount of the debt secured thereby. No issue is raised thereabout.

The answer sets up the defense that the mortgage indebtedness had been fully paid and satisfied by reason of the medical services rendered by the defendant to J. L. Anderson and his family from 1915 to 1940, and that the value of such services was fixed by Anderson in his lifetime by his agreement and repeated statements that the indebtedness secured by the mortgage was considered by him fully paid.

Prior to the institution of the suit, the defendant upon request furnished a statement of the account of his medical services to the Anderson family dating from 1915 to 1940. This statement was made up from memory and was not itemized, and the account totaled the sum of $9,680.00.

The master for Chesterfield County, to whom the case was referred to take the testimony and report the same to the court with his conclusions of law and fact, found every issue against the plaintiffs. Numerous exceptions were filed to all the findings of the master. They were heard before the circuit court, which entered a decree overruling all the exceptions, adjudging the note and mortgage to be fully paid and satisfied, and dismissing the complaint. The plaintiffs by appeal to this court, vigorously challenge this disposition of the case.

The record in this case covers many pages. Several references were held, and numerous witnesses examined. The questions involved present a series of facts and circumstances, all of which are largely in conflict; and which, it is insisted by the respondent, ultimately require the application of one of the oldest principles of equity—"He who seeks equity should do equity".

The crucial issue presented by the appeal involves this inquiry: Were the master and the circuit judge jutified in concluding from the testimony that the respondent, Dr. Purvis, and the decedent, J. L. Anderson, both acted under an understanding and agreement that the mortgage indebtedness was to be extinguished by reason of the many years of professional services rendered by the respondent to the decedent and his family, in consequence of which respondent took no steps to assert his claim or otherwise protect his rights against the decedent's legatee and assignees.

As found by the master and affirmed by the circuit court, the answer of the respondent does not set up a defense based upon a claim to an accounting or a balancing of mutual accounts. The essence of the defense is that the mortgage has been paid and satisfied by the professional services rendered by respondent to J. L. Anderson and his family, which, by agreement between them, constituted an extinguishment of the mortgage debt. On this issue and under this agreement, it is claimed that there was no necessity or reason to prove the precise value of the professional services rendered by the respondent. However, respondent contends that there was relevancy and pertinence in the character and extent of the services rendered as bearing upon the credibility of the testimony respecting the alleged agreement to treat the mortgage as satisfied.

The evidence covers a long period of time, dating from the year 1915, when Dr. Purvis first moved to Cheraw to engage in the practice of medicine, until February 18, 1940, the date of Anderson's death. It is clearly inferable from the

evidence that he sought the aid and friendly cooperation of Anderson, his second cousin, who was a resident of Cheraw and a man of wide business interests. Their association developed into a fast friendship, which continued through the years, and proved most beneficial to Purvis in many material ways. He became the physician of the Anderson family, and Anderson became his benefactor. Through Anderson, Dr. Purvis attended professionally all of the employees at Anderson's brick and veneer plants. Later, when these industries were converted from private ownership to corporations, still owned by Anderson, Dr. Purvis continued to receive the major portion of the medical practice derived therefrom.

The record shows without dispute that Dr. Purvis never presented Anderson a bill for professional services rendered to him and his family; that his books show no charges against Anderson; that the statement of account for such personal services was made up from memory after Anderson's death, after the lapse of twenty-five years, and that Anderson did not know during his lifetime that any charges against him were being held in reserve.

It might be stated in passing that between 1927 and 1940 payments received by Dr. Purvis as medical fees from Anderson's two corporations amounted to $17,000.00, all of which was turned over to Purvis and none of it applied on his mortgage indebtedness.

Purvis states that he got the idea in 1934 that Anderson did not intend to enforce collection of the mortgage, but he frankly states that nothing Anderson said to him led him to this conclusion. It was in the year 1934 that Dr. Purvis, following a serious illness, became incapacitated and practically retired from the active practice of medicine, and the evidence offered by him to substantiate his alleged agreement with Anderson comes after that date.

One witness for respondent detailed a conversation which he stated he heard in the spring of 1939 between Dr. Purvis and Mr. Anderson, in which Anderson asked Purvis if

he had "fixed those papers", since he (Dr. Purvis) had gotten out of the hospital. Dr. Purvis replied that he had not, but that he wished to get it straight before he made a will. Mr. Anderson then said: "I don't mean a will—I mean the deed to Eunice—to Mrs. Purvis". And he then inquired of Dr. Purvis if he owed anyone else, and the respondent replied, "I don't owe anyone but you". Whereupon he was told by Anderson not to let the mortgage stand in the way of the execution of the deed; that he could go ahead and fix his deed, "just as though the mortgage was not there", because it was not recorded.

The mortgage which is the subject of this action was not recorded until July, 1939, but Mr. Anderson had instructed his attorney to file it for record on March 10, 1939. The delay was caused by the preparation of many papers changing the ownership of the Anderson industries from a corporation to a partnership to be owned and operated by Anderson and his four children.

On another occasion, in 1937, Anderson is quoted as saying with reference to the indebtedness of the respondent, "He did owe me, but he does not owe me anything now".

Another witness for respondent quotes Anderson as saying: "He owes me some, but I am not going to bother him about that". And again in the same conversation, Anderson mentioned that Dr. Purvis owed him a mortgage, but said, "I owe Dr. Purvis for his services. I don't consider that he owes me anything at all, much".

Another witness for the respondent overheard a conversation between Dr. Purvis and Anderson, in which the latter told the respondent that he would like Purvis to get his business affairs straightened out. "Of course, I will take care of Eunice, but I would feel better to know that you had gotten your business affairs straightened out". And then he asked him if he owed any money, and Dr. Purvis replied, "No, J. L., I don't owe anything except a mortgage I owe you". Whereupon Mr. Anderson remarked: "Well, I don't

feel that you owe very much, because I feel that I owe you as much as you owe me".

The record discloses that Dr. Purvis and his wife had no children, and that Anderson wished Dr. Purvis, whose health was uncertain, to convey the property to his wife, so that if she survived him she would own the fee.

One other witness for the respondent, his brother, stated that at a time when Dr. Purvis was very ill, he had a conversation with Anderson about the indebtedness, in the course of which the latter told him, "If the truth be known, I would owe Otis more than he owes me".

In November, 1939, while on an overnight hunting trip in Pee Dee swamp, Anderson suffered a severe heart attack. From then to his death on February 18, 1940, he alternated between a hospital in Florence and his home. While at home during this illness, the respondent told him that the mortgage given by him to Anderson had been recorded in July, 1939, and that Anderson replied: "Aw shucks, that should not have been done". And he stated, "Well, go ahead and have Glenn (his son) fix it". Purvis had previously testified that Anderson had told him prior to this that the mortgage had not been recorded.

If Anderson had definitely agreed to accept the professional services of the respondent to himself and family in full discharge of the mortgage indebtedness, then no regard would need to be given to the relative value of such services rendered. The burden of proof, however, was upon the respondent to maintain the affirmative of the issue by clear and convincing evidence. *Young v. Levy*, 206 S. C. 1, 32 S. E. (2d) 889. In the light of the evidence offered by the respondent, to which we have referred, he has in our opinion, failed to establish the alleged agreement by even a preponderance of the evidence. On this point, the evidence is all too vague and inconclusive. See *Redmond v. Strange,* 203 S. C. 35, 26 S. E. (2d) 16.

The evidence offered by the plaintiffs on this issue, considered along with that of respondent, shows conclusively that there was no accord or meeting of the minds between Dr. Purvis and Mr. Anderson as to the cancellation of the mortgage indebtedness.

It will be noted, with reference to the respondent's evidence, that the decedent at no time suggested that he would cancel the lien of the mortgage. No witness quotes him as using the words, "satisfy", "cancel", or "extinguish", and the fact stands out that he at all times retained the mortgage and gave no indication that he intended to physically deliver it up.

It is true that there is no evidence that subsequent to the year 1931, when the note in suit was given, the decedent had demanded any payment thereon. But in March, 1939, when Anderson was re-arranging his business, he instructed his attorney to record the mortgage with the assignment to his four children endorsed thereon, and stated that Purvis had never paid him a cent of principal or interest.

L. C. Dodge, an accountant, testified that he went over Anderson's accounts with him each year, and that the Purvis mortgage was carried from year to year as an asset, and that upon Mr. Anderson's death inheritance and estate taxes were paid on it.

Late in December, 1939, Anderson's son, W. G. Anderson, in response to a request by Dr. Purvis, discussed the mortgage with his father, and he reported his father's decision to the respondent, which was that Purvis could: (1) Pay the mortgage; (2) Convey the property to Anderson and pay a nominal rent of $25.00 per month, or (3) Convey the property to Anderson and live in it as long as he paid the taxes, insurance and upkeep. About the same time in 1939, Anderson stated to his son-in-law: "He (Purvis) wants me to give him his house or the mortgage on his house, and I am not going to do it. I have done more for Otis than any-

one else I know of has ever done for him, and I feel like I have done enough."

We have heretofore stated our conclusion that the record in this case does not show that the respondent and the decedent entered into any agreement that the mortgage indebtedness was to be deemed extinguished by reason of the professional services rendered by the respondent to the decedent and his family. As stated, the burden was upon the respondent to establish this affirmative defense by the most satisfactory and convincing proof. And this he has failed to do. There was no accord and satisfaction, and no meeting of the minds. However, this being an equity proceeding, we think the maxim to which we have heretofore referred, has a relevant bearing and application: "He who seeks equity should do equity".

It is admitted, or not denied, that Dr. Purvis attended the decedent and his family as their family physician continuously from 1915 to 1940, a period of twenty-five years; that he never rendered a bill for services and was never paid anything for such services. Equity imputes an intent to fulfill an obligation, and it is hardly reasonable to infer that the respondent's services through the years were intended to be gratuitous, even though the decedent and the respondent were intimate friends. It may thus be considered that an indebtedness was created and the relationship of debtor and creditor established between the parties.

The question naturally arises, can the plaintiffs, who are legatee and assignee of the mortgage, now compel payment of the mortgage indebtedness by foreclosure in a court of equity until the respondent has been compensated for his professional services, even though, were the respondent asking affirmative relief or attempting to recover in an action at law, his debt would be barred by the statute of limitations. Under the principles and doctrines of equity, before the plaintiffs can obtain from the court the relief asked for, they must give to the respondent that to which he is justly entitled. If

there is a distinctively equitable right to which the defendant is entitled, even though not at common law, the court will make it a condition precedent to the relief of the plaintiffs that they shall grant to the respondent such equitable rights. More especially is this true where the rights of the parties grow out of the same subject matter or the same transaction. 19 Am. Jur., Sec. 466, Page 322.

The rule is that the respondent's adverse equity must grow out of the very controversy before the court, or out of such transactions as the record shows were part of its history; or where it is so connected with the cause in litigation as to be presented in the pleadings and proofs, with full opportunity afforded to the plaintiffs to explain or refute the charges. Pom. Eq. Jur., Vol. 1, Sec. 387, Page 642. Mr. Pomeroy says:

"Section 385: * * * The meaning is, that whatever be the nature of the controversy between two definite parties, and whatever be the nature of the remedy demanded, the court will not confer its equitable relief upon the party seeking its interposition and aid, unless he has acknowledged and conceded, or will admit and provide for, all the equitable rights, claims, and demands justly belonging to the adversary party, and growing out of or necessarily involved in the subject-matter of the controversy.

"Section 386: * * * According to its true meaning, therefore, the terms imposed upon the plaintiff, as the condition of his obtaining the relief, must consist of the awarding or securing to the defendant something to which he is justly entitled by the principles and doctrines of equity, although not perhaps by those of the common law—something over which he has a distinctively equitable right. In many cases, this right or relief thus secured to or obtained by the defendant, under the operation of the rule, might be recovered by him, if he, as plaintiff, the parties being reversed, had instituted a suit in equity for that purpose. But this is not indispensable, nor is it even

always possible. The rule may apply, and, under its operation an equitable right may be secured or an equitable relief awarded to the defendant, which could not be obtained by him in any other manner—that is, which a court of equity, in conformity with its settled methods, either would not, or even could not, have secured or conferred or awarded by its decree in a suit brought for that purpose by him as the plaintiff".

The fact that a debt is barred by the statute of limitations in no way relieves the debtor from his moral obligation to pay it. Moreover, as stated, one of the maxims which courts of equity should always act upon is, "He who seeks equity should do equity". In accordance with this maxim, we think the plaintiffs should be denied affirmative relief until the money justly due the respondent is credited on the mortgage.

When we say that the respondent should be compensated for what is justly due him, we must not be understood as recognizing the validity of the statement of services furnished by him after the death of Anderson, the decedent, and prior to the bringing of this suit. The respondent stated in his testimony that this statement, which is not itemized, was made up almost entirely from memory, and its great magnitude was accounted for by Anderson's alleged financial ability to pay. An inspection of the statement of account would seem to show that it bears little semblance to actuality. For instance: his charge for services from November 23, 1939, until February 18, 1940, the date of Mr. Anderson's death, amounts to $1,795.00 when, according to the record, he did nothing more than pay routine calls at the hospital or the home. He stated that nothing could be done for Mr. Anderson, who was attended by two nurses, except to administer opiates.

In our opinion, the cause must be remanded so that testimony may be taken as to the fair and reasonable value of the services rendered by Dr. Purvis as in *quantum meruit*. The

burden of proving the affirmative of the issue will of course rest upon the respondent, with full opportunity afforded the plaintiffs to explain or refute the charges.

Judgment reversed and case remanded.

BAKER, CJ., and STUKES, J., concur.

TAYLOR and OXNER, JJ., concur in part and dissent in part.

OXNER, J. (concurring in part and dissenting in part).

I am in full accord with the conclusion that the alleged agreement to cancel the mortgage indebtedness, in consideration of professional services rendered by respondent, is not sustained by the evidence. Although in his answer respondent does not undertake to set up a counterclaim or offset for the value of the medical services rendered to the Anderson family, I see no objection to remanding the case for the purpose of determining the fair and reasonable value of these services and crediting the amount so found on the mortgage debt. But I think the majority opinion goes entirely too far in applying the well-known maxim of equity that "he who seeks equity must do equity".

The result of our conclusion that respondent has failed to establish his affirmative defense is this: Appellants hold a past due note and mortgage of respondent which they are entitled to foreclose in a court of equity, but under the holding of the majority opinion they are permitted to do so only at the price of waiving the statute of limitations on this claim for medical services. Although this claim is frequently referred to in the testimony in connection with the mortgage debt, it does not grow out of the mortgage transaction and is an entirely separate matter. The limitation on the application of this maxim is stated in Pomeroy's Equity Jurisprudence, 3rd Ed., Section 387, as follows: "Finally, the principle will not apply so as to compel the plaintiff to do equity, where the relief sought by the plaintiff, and the equitable right or relief secured or awarded to the defendant,

belong to or grow out of two entirely separate and distinct matters. The true meaning of the rule in this respect is, that the equitable right or relief secured to · or conferred upon the defendant must be something connected with the subject-matter of the very suit or controversy for the proper decision of which the principle is invoked. Or, to state the same doctrine in more detailed and particular terms, 'the rule is applied where the adverse equity to be secured or awarded to the defendant grows out of the very controversy before the court, or out of such transactions as the record shows to be a part of its history, or where it is so connected with the cause in litigation as to be presented in the pleadings and proofs, with full opportunity afforded to the party thus recriminated to explain or refute the charges.' "

Various cases involving the application of the maxim and the restrictions which the courts have placed upon it are ably reviewed in *Malcolm et al. v. Talley,* 89 W. Va. 531, 109 S. E. 613. Also see 30 C. J. S., Equity, § 91.

It is stated in 37 Am. Jur., page 63, that "in an action to foreclose a mortgage, claims against the mortgagee which are barred by limitations may not, in the absence of statute, be set off against the debt secured by the mortgage". Under the authorities heretofore mentioned this would be particularly true where, as here, the claim is entirely distinct and separate from the mortgage debt. It was so held in *Bank of Columbia v. Gadsden,* 56 S. C. 313, 33 S. E. 575.

But if we assume that a court of equity is empowered to impose the condition that no part of this claim for medical services shall be barred by the statute of limitations, I do not think it is a power which should be exercised under the facts of this case. Although respondent says it was not until 1934 that he got the idea that Mr. Anderson did not intend to enforce the collection of this mortgage, he admits he did not keep a record of the services rendered to the Anderson family or enter any charge therefor upon his books during any portion of the period covered by this claim. No demand

was ever made upon decedent for payment, nor did respondent ever state to him that he intended to make a charge for these services. Respondent now seeks to establish a claim covering a period of twenty-five years from mere memory, which necessarily has become obscure from lapse of time. He admits that he does not recall the number of visits made to the Anderson home or the particulars of all the services rendered. Anderson is now dead and appellants are deprived of his knowledge relating to this matter. It seems to me inequitable to require his legatee and the assignees of this mortgage to surrender the bar of the statute of limitations to the greater portion of this stale claim which respondent negligently failed to assert during the lifetime of Mr. Anderson. I think the Court has not given effect to another important maxim, "Equity aids the vigilant, not those who slumber on their rights".

I would remand the case for the purpose of allowing the respondent to set up his claim by way of offset, but with the right accorded to appellants of interposing the plea of the statute of limitations or any other defense they may have.

TAYLOR, J., concurs.