Walter R. BROOKS, Jr., Appellant,

v.

MEDTRONIC, INC., a corporation, Appellee,

Association of Trial Lawyers of America, Amicus Curiae.

No. 83–2223.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 1, 1984.

Decided Dec. 21, 1984.

Ellis I. Kahn, Solomon, Kahn, Smith & Baumil, Charleston, S.C., David S. Shrager, President, Association of Trial Lawyers of America, Pittsburgh, Pa., on brief, for amicus curiae.

Before HALL, MURNAGHAN and CHAPMAN, Circuit Judges.

MURNAGHAN, Circuit Judge:

Walter R. Brooks, Jr. appeals from a final judgment entered by the district court on a jury verdict in favor of Medtronic, Inc. Brooks allegedly suffered injuries when his Medtronic cardiac pacemaker failed shortly after it was implanted. Believing Medtronic's pacemaker defective, Brooks brought a products liability action. On appeal Brooks contends that the district court did not properly instruct the jury on the scope of the manufacturer's duty to warn in a products liability action.

## I

On August 7, 1980 Brooks entered the St. Francis Community Hospital in Greenville, South Carolina with an acute myocardial infarction. Brooks, who had a history of heart trouble, was in critical condition. In an attempt to stabilize his condition, Brooks was fitted with a temporary pacemaker, and over the next several days Brooks' internist, Dr. Rowland, and cardiologist, Dr. Ross, evaluated Brooks and concluded that he was a good candidate for a permanent pacemaker. The doctors explained to Brooks and his wife that a permanent unit was indicated because of the extensive history of heart disease and because Brooks lived a fair distance from the nearest hospital. If appellant should experience further heart problems, the doctors said, a pacemaker would increase his chances of surviving long enough to reach the hospital.

On August 12th Brooks met Dr. Childs, the general and thoracic surgeon recommended by Dr. Rowland, and discussed the need for a pacemaker. The following day Brooks underwent implant surgery. Assisting Dr. Childs was a Medtronic repre-

Joseph G. Wright, III, Anderson, S.C. (Ernest C. Trammell, Wright & Trammell, Anderson, S.C., on brief), for appellant.

William M. Grant, Jr., Greenville, S.C. (Edwin B. Parkinson, Jr., Haynsworth, Perry, Bryant, Marion & Johnstone, Greenville, S.C., on brief), for appellee.

sentative trained to provide technical assistance during surgery. The Medtronic representative tested the unit and found it was functioning properly. Later that afternoon, however, Brooks experienced fifteen episodes of ventricular fibrillations. Each attack required the hospital staff to apply counter electrical shock treatments to restore Brooks' heart to a normal paced beat. The fibrillations ended when Dr. Childs disconnected the pulse generator.[1] However, because the defibrillations stressed Brooks' heart, he had no choice but to agree to a second implant. On August 15, 1980 Dr. Childs repositioned the Medtronic lead he had initially inserted in Brooks' heart and implanted a second pulse generator. Since that time Brooks has not had any problems with his Medtronic pacemaker.

On March 22, 1983 Brooks filed a complaint, asserting causes of action for negligence, strict liability, and breach of warranty. At trial Brooks did not pursue his breach of warranty claim. Instead, he attempted to establish (1) that the pulse generator did not work properly; (2) that the Medtronic lead selected by Dr. Childs was defectively designed because the tines or prongs on its end were too short to remain lodged in the heart muscle while fibrous tissue grew around the lead; (3) that the lead became dislodged from his heart tissue and caused the pulse generator to send electrical impulses at inappropriate times; (4) that Medtronic failed to warn him about the risk of lead dislodgement;[2] and (5) that Medtronic was negligent because its representative did not advise his physician that an improved endocardial lead, with longer tines, had become available several months before Brooks underwent implant surgery.[3]

At the close of the evidence, the district judge instructed the jury on Brooks' strict

**1.** A cardiac pacemaker has three component parts: a pulse generator, one or more endocardial leads and metal electrodes. The pulse generator, surgically implanted in the patient's shoulder, houses the circuitry that controls electrical impulses sent to the heart. Connected to the pulse generator is the endocardial lead, an insulated wire attached to the metal electrode. The lead is run intravenously into the heart and in some models is attached to the heart tissue by prongs known as "tines." The lead senses heart functions, carries the information back to the pulse generator, which, acting like a mini-computer, determines whether an electrical impulse is needed to stimulate the heart.

**2.** All experts testified that lead dislodgement was a widely known and generally accepted risk associated with pacemaker surgery. Dislodgement can occur from a variety of sources, including body movement, sneezing, or coughing. The risk is greatest during the period within 24 to 48 hours after surgery; thereafter fibrous tissue grows and eventually the lead becomes firmly imbedded in the heart.

Although the risk of dislodgement was widely known, it was undisputed that Medtronic had provided each doctor with a technical manual explaining the potential for ventricular fibrillation. Dr. Childs was well aware of that risk and testified that prior to July 1981 the dislodgement rate with the particular endocardial lead model he selected, model 6962, occurred in about five to eight per cent of his patients. Dr. Childs, however, did not testify what his dis-

lodgement rate was prior to Brooks' surgery on August 13, 1980.

It was undisputed that Dr. Childs did not inform Brooks about the possibility of lead dislodgement and ventricular fibrillation. On the other hand, Dr. MacFie, an expert witness for Medtronic, testified that he routinely told his patients about such risks. Finally, although Medtronic gave the doctor an informational circular for his patient, Medtronic did not warn the pacemaker recipient about the risk of dislodgement.

**3.** At the time of Brooks' surgery, Medtronic marketed six different endocardial leads. Experts testified that the lead selected by Dr. Childs, Model 6962, was considered an accepted state of the art device and was widely used up until at least the time of trial. Variations on lead 6962, models 6971 and 6972, are similar in basic design but have slightly longer tines. Dr. Childs, who implanted about 100 pacemakers each year, testified that he preferred the new models and had discontinued use of model 6962. Inventory records from St. Francis Hospital indicated that lead 6972, which was approved by the Food and Drug Administration in March 1980, was available when Brooks received his pacemaker. Dr. Childs explained he did not use the new lead model, however, because he was unaware of its availability until July 1981. The Medtronic sales representative testified that every physician in his territory had received literature about new products but had no personal knowledge as to whether Dr. Childs received and read any of that literature.

liability and negligence theories. Both parties objected to portions of the court's charge. Under strict products liability, the district court charged that the manufacturer had a duty to warn *physicians* of any dangerous characteristics that were not well known to the medical community. Brooks' counsel objected that the jury should have been instructed that Medtronic also had a duty to warn the consumer directly of known risks associated with implant surgery. Brooks, however, did not object to other parts of the charge and in particular did not contest the court's negligence instruction.

Medtronic, on the other hand, did object to the form of the negligence instruction. Although agreeing that it had an obligation reasonably to advise the medical community of its product developments, Medtronic argued that it had no duty to insure that particular physicians received notice of new products. The district judge agreed that he may have overstated appellant's case by instructing that Medtronic had a duty to personally warn particular physicians using its products. The district court recharged the jury on negligence.[4]

After some deliberation, the jurors advised the court that they had reached a verdict on the strict liability cause of action, but had not yet agreed on negligence.[5] The jury was told to return for further deliberation. Thereafter Brooks elected to dismiss his negligence action and asked the

Court to instruct the jury to return a verdict solely on the strict liability claim. Undoubtedly Brooks and his counsel regretted the decision for it was a misreading of the probable outcome on strict liability. The jury returned a verdict for Medtronic.

## II

The first issue on appeal is whether, under South Carolina law,[6] a manufacturer of a pacemaker has a duty to warn the consumer directly about potential risks or whether warnings to the physician are instead sufficient. We find no South Carolina cases directly on point. Consequently, we are relegated to ascertaining as best we can how the South Carolina Supreme Court would rule.

■■■ Under the theory of strict products liability, as embodied in section 402A of the Restatement (Second) of Torts (1965), the manufacturer of a product sold "in a defective condition unreasonably dangerous" is liable to the ultimate user who is injured by the product.[7] Certain products, particularly ethical drugs[8] and medical devices, often cause unwanted side effects despite the fact that they have been carefully designed and properly manufactured. In section 402A terminology, such products are deemed "unavoidably unsafe," but are not defective or unreasonably dangerous if they are marketed with proper directions for use or include ade-

---

**4.** The court's second negligence instruction, in part, was as follows:

    Now, if it [referring to the new endocardial lead model] was available, only assuming that you first find that it was available in this area, then whether the Defendant acted—if it was available in this area, then I tell you that the Defendant Medtronics [sic] had a duty to reasonably make this knowledge known to the medical community in this area. It had no duty to personally advise any particular physician of its availability, but merely a duty to advise physicians in general that this newer product was available in the area.

    Now, of course, even if it was available and even if it was generally known, then it still— you remember still that it is the choice of the

physician and the patient as to which model is going to be used in the operation....

**5.** Specifically the forelady sent a note to the court that read "our problem is whether Medtronics [sic] is negligent in not informing the general medical community well enough."

**6.** Both parties agree that South Carolina law governs the diversity action.

**7.** The doctrine of strict tort liability is recognized in South Carolina. *See* S.C.Code Ann. § 15–73–10 (Law.Co-op.1976); *Claytor v. General Motors Corp.*, 277 S.C. 259, 286 S.E.2d 129 (1982); *Marchant v. Lorain Division of Koehring*, 272 S.C. 243, 251 S.E.2d 189 (1979).

**8.** The phrase "ethical drug" refers to a drug available only with a physician's prescription.

quate warnings of potential side effects.[9] *Id.* at comment k. Failure to give such a warning constitutes a "defect" in the product and renders the manufacturer liable for selling a product in an unreasonably dangerous manner. *Id.*

■ Although ordinarily warnings must be given to the ultimate user of a product,[10] a different approach has been developed for prescription drugs. It is settled in a substantial majority of jurisdictions that the duty a manufacturer of ethical drugs "owes to the consumer is to warn only physicians (or other medical personnel permitted by state law to prescribe drugs) of any risks or contraindications associated with that drug." *Stanback v. Parke, Davis and Co.*, 657 F.2d 642, 644 (4th Cir. 1981) (predicting Virginia law). *Accord Reyes v. Wyeth Laboratories*, 498 F.2d 1264 (5th Cir.1974), *cert. denied*, 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974) (Texas law); *Davis v. Wyeth Laboratories, Inc.*, 399 F.2d 121 (9th Cir.1968) (Montana law); *Sterling Drug, Inc. v. Cornish*, 370 F.2d 82 (8th Cir.1966) (Missouri law). If the prescribing physician has received adequate notice of possible complications, the manufacturer has no duty to warn the consumer. In that instance, the physician is called on to act as a "learned intermediary" between the manufacturer and the consumer because he is in the best position to understand the patient's needs and assess the risks and benefits of a particular course of treatment. As the Court explained in *Stanback:*

> The restriction of the duty to warn to physicians alone in ethical drug cases stands as an exception to the general duty of manufacturers to warn ultimate consumers in products liability cases, but it is a rule supported by sound policy considerations, as the Fifth Circuit made

clear in *Reyes v. Wyeth Laboratories*, 498 F.2d 1264, 1276, cert. denied, 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974):

> Prescription drugs are likely to be complex medicines, esoteric in formula and varied in effect. As a medical expert, the prescribing physician can take into account the propensities of the drug, as well as the susceptibilities of his patient. His is the task of weighing the benefits of any medication against its potential dangers. The choice he makes is an informed one, an individualized medical judgment bottomed on a knowledge of both patient and palliative. Pharmaceutical companies then, who must warn ultimate purchasers of dangers inherent in patent drugs sold over the counter, in selling prescription drugs are required to warn only the prescribing physician, who acts as a "learned intermediary" between manufacturer and consumer.

657 F.2d at 644 n. 2. Although the South Carolina Supreme Court has not addressed the issue, we conclude it would adopt the rule, generally accepted and supported by sound policy, restricting the manufacturer's duty to warn to the prescribing physician.

Brooks contends, nevertheless, that the prescription drug exception does not apply on the facts of his case. Two principal reasons are advanced. First, unlike the situation in prescription drug cases, he argues that all cardiac pacemaker patients face identical risks and do not rely on doctors to act as learned intermediaries. Second, Brooks notes that Medtronic, unlike drug manufacturers, often has an opportunity to contact its users prior to surgery.

*See Reyes v. Wyeth Laboratories*, 498 F.2d 1264, 1273–74 (5th Cir.1974), *cert. denied*, 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974). Brooks has not argued that pacemakers are unreasonably dangerous *per se*.

---

9. Commentators have noted that the "unavoidably unsafe" doctrine is not a conceptually pure strict liability theory, but instead borrows negligence concepts. *See, e.g.,* Kidwell, *The Duty to Warn: A Description of the Model of Decision,* 53 Texas L.Rev. 1375 (1978). The sale of an inevitably dangerous product may be "unreasonably dangerous per se" if the potential harm outweighs the public interest in its availability.

10. *See* Restatement (Second) of Torts § 388 (1965).

In support of these arguments, Brooks places reliance on a series of cases involving injuries caused by live polio vaccines in which a few courts have expanded the scope of a drug manufacturer's duty and held that the manufacturer is required to warn the public directly of risks associated with the live vaccine. *E.g., Reyes v. Wyeth Laboratories, supra; Davis v. Wyeth Laboratories, supra.* The courts in those cases have expanded the duty to warn because the vaccines—part of a special nationwide immunization program—were dispensed without the sort of individualized medical balancing at the heart of the prescription drug exception. *Reyes v. Wyeth Laboratories,* 498 F.2d at 1277. Appellant cites the polio cases as proof that courts are narrowing the prescription drug exception. However, as we noted in *Stanback,* "the exception established for the polio cases is quite narrow and highly fact specific." [11]

■ Appellant's attempt to tread his way around the prescription drug exception does not warrant an extended discussion. The testimony adduced at trial demonstrated that the decision to prescribe a cardiac pacemaker involves precisely the sort of individualized medical balancing contemplated by the drug exception. Unlike polio vaccines, pacemakers are not dispensed indiscriminately in mass clinics, but instead are prescribed only after a physician balances the individual's needs against the known risks. Indeed expert testimony in the present case indicated that each pacemaker candidate presents different problems requiring individualized professional judgments about lead models and generator units. The encounter between Brooks and his physician simply was not one between an anonymous member of the public and an equally anonymous dispenser of medication.

We are similarly not persuaded by Brooks' argument that the drug exception should not apply because Medtronic had advance notice of his surgery and therefore had ample opportunity to provide him with a warning. That argument mischaracterizes the purpose of the exception. Although a subsidiary rationale for limiting the manufacturer's duty to warn is based on a concern about the practical problems of providing notice to each consumer, the rule is bottomed on the view that physicians are in a better position to assess risks and determine when a particular patient reasonably should be informed about a risk.

Appellant complains that an affirmance would abrogate the patient's right to know. That prediction overstates the case. The issue raised by the appeal is not whether information should be disclosed at all; instead, the question turns on who is in a better position to disclose risks. It is the physician's duty to remain abreast of product characteristics and, exercising an informed professional judgment, decide which facts should be told to the patient. Once adequate warnings are given to the physician, the choice of treatment and the duty to disclose properly fall on the doctor. Indeed, we have little trouble imagining—particularly with cardiac patients—situations where total disclosure by a manufacturer would not be in the patient's best interest. One in a serious medical condition of the sort experienced by Brooks as a general matter faces unwanted, unsettling and potentially harmful risks if advice, almost inevitably involved and longwinded, from non-physicians, contrary to what the doctor of his choice has decided should be done, must be supplied to him during the already stressful period shortly before his trip to the operating room. We therefore hold that the district court's duty to warn instruction was proper.[12]

11. For example, in *Stanback* we found the polio cases inapplicable and held that, under Virginia law, the manufacturer of a flu vaccine had no duty directly to warn the consumer of a risk of Guillain-Barre Syndrome.

12. Appellant alternatively argues that Medtronic incurred a duty to disclose because it voluntarily provided the user with an informational pamphlet. By failing to disclose the risks associated with its product, appellant argues, Medtronic breached a duty to use reasonable care.

## III

Brooks' second claim of error focuses on the trial court's failure to instruct the jury that Medtronic had a duty to advise his surgeon, Dr. Childs, that a "new improved" endocardial lead was available. Although the trial court initially charged, under Brooks' negligence theory, that Medtronic had such a duty, the judge subsequently called in the jury and explained that Medtronic's duty was to "make this knowledge known to the medical community in this area. It had no duty to personally advise any particular physician." Appellant contends that the second charge was inaccurate.

Regardless of the merit of that contention, we conclude that Brooks is barred from raising the issue on appeal. As previously noted, Brooks dismissed with prejudice his negligence cause of action and submitted his case to the jury solely on a strict products liability theory. After reviewing the transcript we agree with Medtronic that the disputed charge was considered by all to be part of Brooks' negligence theory, not strict liability. Having voluntarily dismissed his negligence cause of action, Brooks may not have a second bite at the apple.[13]

AFFIRMED.

The Court need not address appellant's argument. The record shows that Brooks did not receive the Medtronic circular until *after* the pacemaker was implanted. Consequently, the information provided by Medtronic did not influence Brooks' decision to have the pacemaker implanted.

13. We find no error in the district court's decision to include the "duty to advise" instruction under negligence. Although commentators note that the duty to warn/strict liability cause of action is based on principles of negligence, *see, e.g.,* Merrill, *Compensation for Prescription Drug Injuries,* 59 Va.L.Rev. 1, 31 (1973), the "strict liability failure to warn" is a conceptually distinct cause of action. In *Bly v. Otis Elevator Co.,* 713 F.2d 1040, 1045–46 (4th Cir.1983) we explained that duty to warn under breach of warranty, the functional equivalent of strict liability, focuses upon whether the lack of warning rendered the *product* unreasonably dangerous; whereas a manufacturer may be liable in negligence for failure to warn if its *conduct* is unreasonable.

Under strict liability Brooks properly sought to prove that model 6962 was unreasonably dangerous because Medtronic failed to warn about the risk of dislodgement. Under that theory, the development and availability of another endocardial lead was irrelevant. To find Medtronic liable under a failure to warn/strict liability theory, one would have to conclude that Medtronic failed adequately to disclose risks associated with 6962. Strict liability focuses its attention on the instrument here in question, namely, the 6962 model and the duty to warn relates to *its* characteristics. The failure to inform of the existence of another apparatus (here model 6972) might arguably generate an action in negligence, but not one for failure to disclose something about the model 6962.

Moreover, there is no indication that Brooks made a request for a charge presenting the theory to the jury. Brooks' failure to request an instruction further bars the appeal. *See* Fed.R. of Civ.P. 51.