**R.D. PADGETT, Plaintiff,**

v.

**SYNTHES, LTD. (U.S.A.), Defendant.**

**No. A–C–86–294.**

United States District Court, W.D. North Carolina, Asheville Division.

Jan. 25, 1988.

Bob Warren, Black Mountain, N.C., Tom Johnson, Hardeeville, S.C., for plaintiff.

Isaac N. Northup, Jr., Steven D. Cogburn, Asheville, N.C., for defendant.

## ORDER

ROBERT D. POTTER, Chief Judge.

THIS MATTER is before the Court on Defendant's Motion, pursuant to Rule 50(a), for a directed verdict at the close of Plaintiff's evidence.

This is a products liability case which was tried before the undersigned and a jury at Asheville, North Carolina on January 12 and 13, 1988. Bob Warren and Darrell Thomas Johnson, Jr., Attorneys at Law, represented Plaintiff and Isaac N. Northrop, Jr., Attorney at Law, represented Defendant.

## FACTS

Plaintiff was involved in a one car automobile accident on December 21, 1984 resulting in an open transverse comminuted fracture of the right tibia and fibula. The fracture was reduced by Dr. David Capiello, an orthopedic surgeon, who applied a compression plate to the tibia after an open reduction of the fracture was carried out. Defendant is the manufacturer of the compression plate.

There were inserted in the package in which the plate was contained instructions for the operating surgeon, Plaintiff's Exhibit 7. The pertinent part of the instructions reads as follows:

FOR THE PERSONAL ATTENTION OF THE OPERATING SURGEON

**SUGGESTIONS CONCERNING PARTIAL WEIGHT AND NONWEIGHT-BEARING ORTHOPEDIC APPLIANCES**

The use of metallic surgical implants provides the orthopedic surgeon a means of accurate bone fixation and helps generally in the management of fractures and

reconstructive surgery. These implants are intended as aids to normal healing, but are not intended to replace normal body structures or bear the weight of the body in the presence of incomplete bone healing.

In using partial weight-bearing or non-weight-bearing appliances (orthopedic devices other than prostheses), a surgeon should be aware of the following:

(1) Correct selection of the implant is extremely important. The potential for success in fracture fixation is increased by the selection of the proper size, shape, and design of the implant. The size and shape of the human bones presents limiting restrictions on the size and strength of implants. No partial weight-bearing or nonweight-bearing device can be expected to withstand the unsupported stresses of full weight-bearing. Until firm bone union is achieved, the patient should employ adequate external support and restrict physical activities which would place stresses upon the implant or allow movement at the fracture site and delay healing.

. . . .

(5) Postoperative care is important. A patient should be instructed on the limitations of his metallic implant, and should be cautioned regarding weight-bearing and body stresses on the appliance prior to secure bone healing.

In May of 1985, the plate broke, and Plaintiff filed his Complaint in May of 1986, alleging as his first cause of action, among other things:

... that while using said plate ... for its known and intended purpose, a defective portion broke, causing his leg bone to separate ...

injuring Plaintiff, which injuries were the direct and proximate result of the negligence, recklessness, willfulness, and wantonness of Defendant in that Defendant failed to inspect the plate, failed to recognize and correct existing or potential dangers, failed to provide a plate which was reasonably safe, failed to warn Plaintiff of the dangers in the use of the plate, placed in commerce surgical plates which were improperly designated for safety "... when being used in a manner which could have been anticipated and foreseen ...", and supplied for use of Plaintiff a surgical plate with oblique holes of a diameter leaving inadequate edge distance, ".. in the defendant's failing to conspicuously place warnings or other notices on or about the plate furnished, of dangers which were known, or should have been known, to the defendant ...", in violating accepted standards of safety in the sale of, manufacture, use, or distribution of surgical plates, and in failing to use the degree of care or caution of a reasonable and prudent person under the circumstances then existing.

Plaintiff's Complaint alleged as a second cause of action that Plaintiff warranted the plate safe for the intended use, and that the warranties were not true and that the plate was not suitable for the purposes intended, and that the plate was dangerous and defective and created a danger which proximately caused Plaintiff's injuries.

For a third cause of action Plaintiff alleged that Defendant knew the plate would be used for mending broken bones and that there would be no further inspection by persons such as Plaintiff, that Defendant represented that the plate would perform safely and would not constitute an unreasonable danger to persons using it, and that when used in a manner which could be anticipated it was in fact unsafe for its intended use, was unreasonably dangerous and unsafe on the occasion complained of for Plaintiff and that it would and did break resulting in the injury to Plaintiff.

## PLAINTIFF'S EVIDENCE

Plaintiff's evidence consisted of his testimony, his wife's testimony, the deposition of Dr. David Capiello, and of James F. Hills, whom the Court qualified·as an expert in the field of mechanical engineering and metallurgical engineering.

Plaintiff testified, among other things, that he walked on his leg after the cast was removed, that in April of 1985 his leg started hurting, and that in May he had

walked twenty or thirty feet when his leg collapsed and when he returned to his house and sat down he heard the plate break. He further testified that he went back into the hospital for another operation. He further testified as to his work, and the restrictions on his activities after he returned to work, and the pain he had suffered.

Plaintiff's wife testified as to the restrictions on Plaintiff's activities, and that he was walking without crutches or other support when the plate broke.

Dr. Capiello was not available to testify at the time of trial and his deposition, in its entirety, was read to the jury and into the record.

Dr. Capiello testified that Defendant's compression plate was applied to Plaintiff's fracture because when you apply pressure to a fracture it enhances healing and eliminates micromotion which in turn reduces pain. (Dep. p. 5, l. 23–25; p. 6, l. 1–3).

On January 18, 1985, on a visit to Dr. Capiello's office, Plaintiff's leg was x-rayed, showing no loss of alignment and Plaintiff was told to continue nonweight-bearing ambulation with crutches, and to return in three weeks. (Dep. p. 7, l. 22–25; p. 8, l. 1–6).

Dr. Capiello kept the cast on Plaintiff's leg until April 23, 1985. (Dep. p. 11, l. 3–7). On May 7, 1985, the fracture site was still very slightly visible. (Dep. p. 11, l. 13–16). Dr. Capiello testified that Plaintiff's type of fracture generally takes longer to heal because it was a short transverse fracture "... and because it is transverse, there's very little shear, so therefore by putting a vertical loading force, you are putting a load on it perpendicular to the fracture, so it would further compress the fracture, and, in my own mind and in my thinking and rationale, would further enhance healing." (Dep. p. 13, l. 10–20).

On May 24, 1985 Dr. Capiello examined Plaintiff and found that his fracture was incompletely healed (Dep. p. 16, l. 8–25; p. 17, l. 1). He testified that although the fracture looked good at first it was then beginning to "... kind of turn sour, so to speak at that time." (Dep. p. 17, l. 6–9).

On May 29, 1985, when the cast broke, x-rays revealed that the plate had broken and there was motion of the fracture site, and Dr. Capiello applied a short leg cast. (Dep. p. 17, l. 11–17).

On page 18, lines 10–25 and on page 19, lines 1–5, Dr. Capiello testified as follows:

Q. Is there any connection, in your opinion, between the plate having broken and the fracture site having movement at it or in it, whichever is proper?

A. Well, I don't know if there's a causal connection. I would certainly conclude at that point that there was enough motion at the fracture site, or incomplete healing, and perhaps the patient placed too great a strain on it, or maybe he jumped on it, maybe he twisted, maybe he fell, I don't know, but whatever the force was, there was a force great enough to then break the plate.

Q. All right, sir. To ask it in sort of an opposite way: Prior to then, was the plate, together with whatever else you had done, keeping there from being motion in the fracture site?

A. Well, yes and no. Healing would certainly prevent motion of the fracture site, and an intact plate, if it is doing its job, would also aid in preventing motion of the fracture site, so there are two things working there. And, of course, the cast and immobilization and whatever.

After the plate broke, it was removed and Dr. Capiello operated again and inserted a Lottes nail, a type of intramedullary nail inside the bone (Dep. p. 19, l. 10–24).

On page 27, lines 15–25, and on page 28, lines 1–3 of Dr. Capiello's deposition, he testified as follows:

Q. Had this plate not fractured, do you have an opinion as to whether Mr. Padgett's healing process would have gone better or worse?

A. I really can't answer that question; that is, I've seen several people over the years who have had an excellent plating, who have gone on to heal quite rapidly, and others who have had a plate put on, either by myself or by

other competent physicians, and the bone just hasn't healed, even though the plate never fractured, even though the plate was intact and the surgery went extremely well. There's some times when the bone just doesn't heal. So, it can go any way, actually. It's a very difficult problem.

On page 31, lines 3–22, Dr. Capiello testified as follows:

Q. As I understand it, most things in medicine are subject to some uncertainty or some unknowable, but in your opinion, would Mr. Padgett's healing have gone better had the plate not fractured?

BY MR. NORTHRUP:

Objection to form. Asked and answered.

BY THE DEPONENT:

Well, you asked me that question twice before.

DIRECT EXAMINATION RESUMED BY MR. JOHNSON:

Q. I apologize. If that's the same question, I understand your previous answer.

A. I mean, it certainly could have, and then again it couldn't have. If the plate hadn't broken, the fracture could still go on to a delayed or nonunion despite the fact that the plate may be fully intact. I've even seen fractures heal after a plate or whatever fixation device is used has broken, and then the bone goes on to heal. So, I mean, it could really go both ways. So, I can't really answer that question.

On cross-examination Dr. Capiello testified that on June 17, 1985 when Dr. Capiello operated on Plaintiff's leg again, Plaintiff demonstrated a clear-cut nonunion of a slightly comminuted fracture in the middle third of the right tibia. (Dep. p. 36, 1. 6–21). He further testified that on that date that even though there was some healing at that time there was very little or no healing at the fracture site. (Dep. p. 37, 1. 3–10).

Dr. Capiello further testified that the admission summary to the hospital stated: "x-rays demonstrated a fracture of the tibial plate, evidently a poor union of fracture had stressed the plate." (Dep. p. 37, 1. 11–18).

Plaintiff's last witness, Mr. James F. Hills, P.E., was qualified by the Court as an expert in the field of mechanical engineering and metallurgy. Mr. Hills had a bachelors in Mechanical Engineering and in Business Administration, had attended seminars of the American Society for Metals in 1958 and an Aircraft Mechanics Metallurgical Course in 1964. He was one of three founders of Applied Technical Services, Inc., and had organized and managed up to 200 materials and manufacturing engineering specialists for the purpose of evaluating new materials for aircraft and ground equipment applications. He had directed the activities of technicians in the development of test programs for metallurgical and structural failure analysis and was a member of several societies of professional engineers and had been with Lockhead–Georgia Corporation for 30 years. Mr. Hills had no training in biomedical engineering, and never saw a plate such as the one in this lawsuit until he saw this one.

Obviously, Mr. Hills was only minimally qualified to testify concerning the plate involved in this lawsuit, but the Court qualified him on the theory that Plaintiff obviously needed technical testimony which only an expert could provide, and felt that under Rule 702, Mr. Hills may possibly assist the trier of fact to understand the evidence, and that in any event the qualification of the witness or lack thereof could be weighed by the jury.

As it turned out, Mr. Hills knew a great deal about airplane wings, but next to nothing about the subject of this lawsuit, the plate applied to Plaintiff's tibia.

His testimony was essentially that from an engineering standpoint, the design of the subject plate could be greatly improved in that it could be made thicker and/or wider and out of a material such as titanium which would have a better fatigue property, and by so changing it, could improve the life of the plate to three years.

He testified that he had no training in medical engineering, that he did not know

if his solution of a wider and/or thicker plate and a different metal would be feasible and that he had not consulted any physicians to determine that.

He made no tests of the subject plate for hardness. He had simply looked at it. He had never examined a similar plate, did not know when the plate was designed, did not know its failure rate, had not read the package insert, Plaintiff's Exhibit 7, and did not know the function of the plate.

He admitted that the plate met the minimum standards of the American Society for Testing Materials (ASTM) for orthopedic implants. He had no idea of the affect on the human body of his proposed changes to a wider, thicker plate and a different metal. At the time he formed his opinion he thought the plate was to be weight-bearing. He admitted that according to ASTM standards this plate was designed correctly. He never reviewed any orthopedic books as to the use of the subject plate and did not know if titanium would result in a different healing time.

In summary, Plaintiff's expert was able to testify that from an engineering standpoint a thicker and wider plate would be stronger and that titanium would be more flexible, but he could not testify if that was practical in the environment of the intended use of this compression plate. His assumptions were also that the plate was to be weight-bearing, and his testimony demonstrated the number of pounds over a period of time that the plate would have to absorb, with Plaintiff walking on it an assumed number of hours each day from the time that it was inserted.

At the the close of Plaintiff's evidence Defendant moved for a directed verdict under Rule 50(a) of the Federal Rules of Civil Procedure on the grounds:

(1) No competent evidence of a design defect in subject plate, and therefore no actionable negligence.

(2) No competent evidence that an alternative design would have prevented the plate from breaking.

(3) The fact that plate broke did not result in any injury or damage to Plaintiff.

(4) The plate was not used properly; *i.e.,* not used for the purposes for which it was designed.

## DISCUSSION

The grounds for Defendant's Motion are well taken.

(1) No competent evidence of a design defect in subject plate, and therefore no actionable negligence.

Plaintiff's evidence is that the plate was not designed to be weight-bearing. The package insert, Plaintiff's Exhibit 7, which came with the subject device is replete with warnings concerning the use of the plate. It very specifically states:

The use of metallic surgical implants provides the orthopedic surgeon a means of accurate bone fixation and helps generally in the management of fractures and reconstructive surgery. These implants are intended as aids to normal healing, but are not intended to replace normal body structures or bear the weight of the body in the presence of incomplete bone healing.

Further in Paragraph (1) the suggestions very specifically state:

... No partial weight-bearing or non-weight-bearing device can be expected to withstand the unsupported stresses of full weight-bearing. Until firm bone union is achieved, the patient should employ adequate external support and restrict physical activities which would place stresses upon the implant or allow movement at the fracture site and delay healing.

Paragraph (5) of Plaintiff's Exhibit 7 very specifically states:

(5) Postoperative care is important. A patient should be instructed on the limitations of his metallic implant, and should be cautioned regarding weight-bearing and body stresses on the appliance prior to secure bone healing.

The record of Dr. Capiello's deposition demonstrates clearly that there was incomplete healing of the bone at the time that the plate broke, which is one of the circum-

stances to be considered as set out in Plaintiff's Exhibit 7; *i.e.*, "... until firm bone union is achieved, the patient should employ adequate external support and restrict physical activities which would place upon the implant ..."

■ Mr. Hills testified that if the plate was not designed to be weight-bearing, that it was adequately designed, and that he had not determined from any physician if his solution of a wider, thicker plate was feasible for the proposed use, and that he had not read Plaintiff's Exhibit 7 when he formed his opinion. In light of the evidence in this case, his opinion therefore is of no value to Plaintiff's case.

It is elementary, of course, that negligence is the breach of a duty to use ordinary care to protect others from injury. Plaintiff has simply not presented any competent evidence of a breach of Defendant's duty to Plaintiff, which was a proximate cause of any injury to Plaintiff.

■ Plaintiff alleged further in Count One that Defendant was negligent in that it failed to conspicuously place warnings on or about the plate furnished of dangers which were known or should have been known to Defendant. Plaintiff failed to offer any evidence of that allegation, and, in fact, his Exhibit 7 belies any such allegation. The warnings when given in the insert to the physician were sufficient notice to Plaintiff. *See* N.C.Gen.Stat. § 99B–4. *Brooks v. Medtronic, Inc.*, 750 F.2d 1227 (4th Cir.1984); *Stanback v. Parke, Davis & Co.*, 657 F.2d 642 (4th Cir.1981).

(2) No competent evidence that an alternative design would have prevented the plate from breaking.

Plaintiff's evidence on this point, through its expert witness, Mr. Hills, was that a wider and/or thicker plate would have been less likely to break, and that possibly titanium would have been a better material. However, Mr. Hills is not a biomedical engineer and did not discuss his "solutions" with any physician to see if they were feasible. As stated in Plaintiff's Exhibit 7: "The size and shape of human bones presents limiting restrictions on the size and strength of implants."

Mr. Hills could not and did not testify whether or not his proposed increase in the width and/or thickness of the plate could satisfy those restrictions.

(3) The fact that plate broke did not result in any injury or damage to Plaintiff.

■ The plain fact of the matter is that Plaintiff was a slow healer and at the time the plate was removed in June of 1985 he demonstrated a clear-cut nonunion of a slightly comminuted fracture in the middle third of the femur (Capiello Dep. p. 36, 1. 5–21) and that there was little or no healing at the fracture site. (Dep. p. 37, line 5–9). X-rays demonstrated a fracture of the tibial plate; evidently a poor union of fracture had stressed the plate. (Dep. p. 37, 1. 15–24).

The nonunion of the bone or its failure to heal was not attributed to Defendant's plate breaking, even in Plaintiff's allegations, and certainly not in the evidence. As Dr. Capiello stated in his deposition, there are some times when a bone simply does not heal whether the plate fractured or not. (Dep. p. 27, 1. 15–25; p. 28, 1. 1–3; p. 31, 1. 3–22).

The Court previously denied Defendant's Motion for summary judgment based on this contention, in the belief that Plaintiff should be given the opportunity to present positive evidence that the plate's breaking resulted in injury to him. Plaintiff failed to bring out any such evidence at trial.

(4) The plate was not used properly; *i.e.*, not used for the purposes for which it was designed.

Dr. Capiello testified that he was in keeping with the guidelines and recommendations of the manufacturer of the plate when asked if he did anything contrary to what the manufacturer of the plate indicated he should do with the plate. (Dep. p. 34, 1. 5–14).

There was never any question raised about whether the plate was properly applied by the Doctor. The question is whether the plate's having broken under the weight-bearing stress to which it was subjected without external support and prior to secure bone healing constitutes evi-

dence of negligence in its manufacture or of breach of warranty by Defendant.

 Plaintiff's own evidence is clear that there was a nonunion of the fracture which had stressed the plate, (Dep. p. 38, 1. 12–21; p. 37, 1. 15–18), and that he was walking without a cast or crutches when the plate broke. In other words, if there was no union between the upper and lower portions of the tibia, then the plate was obviously bearing Plaintiff's weight when he stood on it after the cast was removed, and without crutches. The instructions clearly indicate that the plate was not designed to bear weight.

## CONCLUSION

Rule 50(a) provides for a Motion for a directed verdict at the close of the evidence offered by an opponent and that the Motion state the specific grounds therefor. Defendant has complied with the Rule.

This Court very rarely grants a directed verdict at the close of Plaintiff's evidence. However, Plaintiff in this case has simply failed to offer evidence support his allegations. He either was unable to find an expert in the field of biomedical engineering to testify in support of his allegations, or simply was satisfied to rely on the testimony of a mechanical engineer who may be qualified to testify as to stresses on metals in airplane wings, but obviously knew little or nothing about the design and use of the plate in the human body which is the subject of this lawsuit.

His testimony added nothing to aid the jury, and in fact, was favorable to Defendant when he testified that the plate was designed properly if it was not intended to be weight-bearing, which it was not.

NOW, THEREFORE, IT IS ORDERED that Defendant's Motion for a directed verdict at the close of Plaintiff's evidence is *GRANTED.*

A Judgment dismissing this action with prejudice will be filed.

## JUDGMENT

THIS MATTER came on to be heard before the undersigned and a jury at Asheville, North Carolina on January 12 and 13, 1988. Bob Warren and Darrell Thomas Johnson, Jr. Attorneys at Law, represented Plaintiff and Isaac N. Northrop, Jr., Attorney at Law, represented Defendant.

The Court has filed an Order simultaneously herewith directing a verdict for Defendant.

NOW, THEREFORE, IT IS ADJUDGED that Plaintiff's action be, and it is hereby *DISMISSED* with prejudice and each party shall pay his and its own costs.