**Beatrice G. STANBACK, Appellant,**

v.

**PARKE, DAVIS AND COMPANY, Appellee.**

**No. 80–1749.**

United States Court of Appeals, Fourth Circuit.

Argued April 7, 1981.

Decided Aug. 27, 1981.

See also, D.C., 502 F.Supp. 767.

Michael K. Quinn, Roanoke, Va. (Richard E. Viar, Dodson, Pence, Viar, Young & Woodrum, Roanoke, Va., on brief), for appellant.

William B. Poff, Roanoke, Va. (Woods, Rogers, Muse, Walker & Thornton, Roanoke, Va., on brief), for appellee.

Before PHILLIPS and ERVIN, Circuit Judges, and ANDERSON,* District Judge.

ERVIN, Circuit Judge:

Beatrice Stanback appeals the district court's grant of summary judgment to Parke, Davis & Company (Parke-Davis) in her products liability suit against the company for its failure to warn of the risk of injuries allegedly related to an influenza vaccine. For reasons that follow, we affirm.

### I.

This case concerns Mrs. Stanback's injuries stemming from a neurological disorder known as Guillain-Barre Syndrome (GBS). After contracting GBS in late 1976, Mrs. Stanback was totally paralyzed and required hospitalization and convalescent treatment for almost a year. Since that time she has regained some, but not all, of her previous physical abilities.

In the spring of 1976, Mrs. Stanback suffered an attack of influenza with bronchitis, which motivated her to visit Dr. Edmunds, whom she had last seen in 1963. Because of that illness she resolved to get a flu shot the following fall. She returned to Dr. Edmunds' office on September 23, 1976, at which time she received from him a half-dose of Fluogen, a Parke-Davis flu vaccine. She visited Dr. Edmunds again on October 27, 1976, for a second half-dose flu vaccination.

Shortly after the second injection, Mrs. Stanback began to experience neurological symptoms. She returned to Dr. Edmunds on November 4, 1976, complaining of aching, numbness in her fingers and hands, dizziness, and insomnia. Dr. Edmunds concluded that she was experiencing acute labyrinthitis and generalized osteoarthritis.

___

* The Honorable G. Ross Anderson, Jr., United States District Judge for the District of South Carolina, sitting by designation.

Subsequently admitted to the hospital, Mrs. Stanback was eventually diagnosed as having GBS.

In the 1976 package insert accompanying the flu vaccine, Parke-Davis did not warn of a risk of GBS associated with flu vaccines. Mrs. Stanback was unaware of any such risk, moreover, when she received the vaccinations.

Mrs. Stanback filed suit against Parke-Davis in 1978, alleging entitlement to damages under theories of negligence, breach of warranty, and strict liability for Parke-Davis' failure to warn her and her physician of the dangers associated with the use of Fluogen. Parke-Davis answered the complaint, both parties filed and answered interrogatories, and depositions were taken. Parke-Davis then moved for summary judgment on the ground that its failure to warn was not the cause in fact of Mrs. Stanback's illness, even assuming that it had a duty to warn physicians of a risk of GBS associated with the vaccinations and that the second injection caused the onset of the GBS. In so arguing, Parke-Davis relied on deposition testimony of Dr. Edmunds, which established that he had not read the package insert accompanying the vaccine but that he knew of the risk of GBS associated with it, and on an affidavit from Dr. Edmunds, which stated:

It is not my practice, and I do not deem it necessary, to advise patients about the package insert "warning" which accompanies flu vaccines. This was true before the Guillian-Barre Syndrome [sic] warning in 1976 and it is true today.

The district court rejected Parke-Davis' argument, reasoning that Dr. Edmunds' acts or omissions should not exonerate Parke-Davis from liability for failure to warn, and formulated an alternative causation standard, which required Mrs. Stanback to show that a reasonable physician would have treated her in a manner which would have avoided or reduced her injuries. Mrs. Stanback then submitted an additional affidavit and deposition testimony. The district court ultimately concluded, however, that Mrs. Stanback had failed to present adequate proof of causation, and it therefore granted summary judgment to Parke-Davis.

## II.

Fluogen is an ethical drug,[1] and the well-settled rule is that the duty an ethical drug manufacturer owes to the consumer is to warn only physicians (or other medical personnel permitted by state law to prescribe drugs) of any risks or contraindications associated with that drug. *See Reyes v. Wyeth Laboratories*, 498 F.2d 1264 (5th Cir.), *cert. denied*, 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974); *Davis v. Wyeth Laboratories, Inc.*, 399 F.2d 121 (9th Cir. 1968); *Sterling Drug, Inc. v. Cornish*, 370 F.2d 82 (8th Cir. 1966).[2] We sit as a Virginia court in this diversity action and therefore look to Virginia substantive law for authority. Having not been cited to a case on point and finding no direct authority ourselves, we assume that the Virginia Supreme Court would follow the general rule in defining Parke-Davis' duty to warn.

1. An ethical drug is one obtained by prescription, as opposed to a drug sold over the counter.

2. The restriction of the duty to warn to physicians alone in ethical drug cases stands as an exception to the general duty of manufacturers to warn ultimate consumers in products liability cases, but it is a rule supported by sound policy considerations, as the Fifth Circuit made clear in *Reyes v. Wyeth Laboratories*, 498 F.2d 1264, 1276, *cert. denied*, 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974):

Prescription drugs are likely to be complex medicines, esoteric in formula and varied in effect. As a medical expert, the prescribing physician can take into account the propensities of the drug, as well as the susceptibilities of his patient. His is the task of weighing the benefits of any medication against its potential dangers. The choice he makes is an informed one, an individualized medical judgment bottomed on a knowledge of both patient and palliative. Pharmaceutical companies then, who must warn ultimate purchasers of dangers inherent in patent drugs sold over the counter, in selling prescription drugs are required to warn only the prescribing physician, who acts as a "learned intermediary" between manufacturer and consumer.

For purposes of summary judgment, Parke-Davis does not contest that, under Virginia law, it had a duty to warn physicians of a risk of GBS associated with Fluogen and that it failed to give such a warning. It also concedes, for purposes of argument, that the second Fluogen injection caused the onset of GBS in Mrs. Stanback. Instead, it argues that summary judgment was appropriate on the singular ground that Mrs. Stanback has, as a matter of law, failed to present sufficient evidence that the failure to warn was the cause in fact of her injury. Because Mrs. Stanback must be able to prove that the failure to warn caused the injury under any of her theories of liability, we accept Parke-Davis' characterization of the causation question as potentially dispositive of all of her claims.[3]

■ Given the peculiar facts of this case, we agree that there is not sufficient evidence of causation to allow the question to be put to a trier of fact. Dr. Edmunds testified in his deposition that he knew of the risk of GBS associated with the flu vaccines such as Fluogen at the time he vaccinated Mrs. Stanback. He also averred that he had not found it necessary and did not make it his practice to advise patients about the risks associated with flu vaccinations. Whatever may be said about Dr. Edmunds' policies and decisions from the standpoint of the patient, it is clear that they precluded Parke-Davis' failure to warn from having any effect whatsoever on Mrs. Stanback's injury.[4] Even if Parke-Davis

had fully warned Dr. Edmunds of any risk of GBS associated with flu vaccines at the time Mrs. Stanback received the second vaccination, the uncontradicted evidence establishes that Mrs. Stanback would have nevertheless received the flu vaccinations despite the slight risk, and would not have been informed of the risk. Dr. Edmunds' decisions and actions—made in full knowledge of the information which an adequate warning would have contained—therefore insulate Parke-Davis from any liability resulting from its failure to warn.

■ In reaching this conclusion, we are keenly aware of a judicial inclination in certain instances to forbid intervening acts or omissions of a physician from insulating a drug manufacturer from liability. *See, e. g., Hamilton v. Hardy*, 37 Colo.App. 375, 549 P.2d 1099 (1976) (when ethical drug manufacturer puts drug on market without adequate warning, prescribing physician's conduct may not insulate manufacturer from liability if inadequacy of the warning might have contributed to plaintiff's injury). The policy is a sound one and one which should be followed in a failure to warn case when the evidence suggests that a physician might have heeded an adequate warning. In that case it is clear that the failure to warn could make a difference and would be a cause in fact of an injury.

We recognize an important distinction, however, between a failure to warn case in which the physician might have responded

---

**3.** Because we find the causation issue to be controlling, we need not decide whether the Virginia Supreme Court would recognize as a cause of action the strict liability claim.

**4.** In certain failure to warn cases (notably ones involving oral contraceptives), it is possible to establish evidence of causation not only by showing that a physician would not have given the patient a certain medicine but also by showing that a properly warned physician could have detected early signs of an adverse reaction to a drug and reduced the injury. The evidence in this case indicates that, unfortunately, once GBS manifests itself, there is no specific treatment available to arrest it or reverse its course. The deposition testimony of Mrs. Stanback's witness Dr. Hattwick is particularly instructive:

[O]nce the illness starts, there is no specific treatment the physician can use to stop it and reverse it. The treatment is basically to prevent the disease from progressing or having complications.

There are medicines that are used to try to modify the course of it. Steroids, in particular, are commonly used. But the disease, of course, basically tends to progress more or less independent of what the physician specifically does. Major treatment is designed to prevent complications.

Because of the nature of the illness, Mrs. Stanback's attempts to show causation have been limited only to the question whether she would have initially received the vaccine had adequate warnings been given.

to an adequate warning and one in which it is affirmatively established that he would not have. In the first case, there is evidence of causation; in the latter case there cannot be. *See, e. g., Chambers v. G. D. Searle & Co.,* 441 F.Supp. 377 (D.Md.1975), *aff'd,* 567 F.2d 269 (4th Cir. 1977) (evidence showed that adequate warnings of risks associated with oral contraceptives would not have made a difference in physician's treatment of plaintiff; plaintiff, therefore, failed to establish causation); *Vaughn v. G. D. Searle & Co.,* 272 Or. 367, 536 P.2d 1247 (1975), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976) (there was no evidence that even a properly warned physician would have treated plaintiff differently or removed her from oral contraceptives prior to her injury and, therefore, no proof of causation); *McEwen v. Ortho Pharmaceutical Corp.,* 270 Or. 375, 528 P.2d 522 (1974) (there was substantial evidence that, if adequate warnings had been given to physicians, those physicians would have recommended that plaintiff cease using oral contraceptives before her injuries became irreversible; therefore, there was sufficient proof of cause in fact).

The case before us falls within the latter description, as the record conclusively demonstrates that Dr. Edmunds' decisions and actions would not have been affected in the least by the communication of an adequate warning. As there is a complete lack of evidence indicating that Parke-Davis' failure to warn her physician was a factor in producing her injury, we conclude that Mrs. Stanback has failed to adduce sufficient proof of causation under any of the theories of liability set forth in her complaint to survive the motion for summary judgment.

### III.

Possibly in anticipation of our reaching this conclusion, Mrs. Stanback argues for reversal of the summary judgment primarily on the ground that Parke-Davis had the duty not only to warn physicians but also to warn her directly of the alleged risk of GBS associated with flu vaccines. We agree that, under this theory of the case, the proof presented to the district court would be sufficient on the question of causation to survive the summary judgment motion.[5] We conclude, however, that the Virginia Supreme Court would decline to expand the scope of Parke-Davis' duty to warn in this case to encompass warnings to ultimate consumers.

In a small number of cases concerning injuries resulting from live virus polio vaccines, courts have indeed expanded the scope of a drug manufacturer's duty to warn of the risks associated with an ethical drug to require that the public be warned. *See, e. g., Givens v. Lederle,* 556 F.2d 1341 (5th Cir. 1977); *Reyes v. Wyeth Laboratories,* 498 F.2d 1264 (5th Cir.), *cert. denied,* 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974); *Davis v. Wyeth Laboratories, Inc.,* 399 F.2d 121 (9th Cir. 1968). This duty was imposed upon the manufacturer because the vaccines were not dispensed as prescription drugs, that is, they were "dispensed without the sort of individualized medical balancing of the risks of the vaccine that is contemplated by the prescription drug exception." *Reyes v. Wyeth Laboratories,* 498 F.2d at 1277. The polio cases concerned a special, nationwide immunization program undertaken to profit from a remarkable breakthrough in medical research. Because the manufacturers of the live virus vaccine knew that there was a small risk of contracting polio associated with the vaccine and could also foresee that the vaccine was going to be distributed on a large scale, often by persons other than doctors, and without any individual attention given to the recipients, courts have held them liable

---

**5.** In the record is the affidavit of Mrs. Stanback, which states that if she had received a warning from Parke-Davis or from her doctor that neurological side effects, including GBS, might result from her inoculations with Fluogen, she "would have made further inquiry as to the nature and likelihood of such consequences or side effects and, thereafter, having been so informed, would have declined to be inoculated with such vaccine." Additionally, Mrs. Stanback would be entitled to the presumption that a warning, had it been given, would have been heeded. *See Reyes v. Wyeth Laboratories,* 498 F.2d at 1281–82.

for failing to warn the public of the risks associated with the vaccine when the vaccine was distributed by nonmedical personnel in one of the popular mass immunization clinics, *see Davis v. Wyeth Laboratories, Inc.*, 399 F.2d 121 (9th Cir. 1968), by a nurse in a public health clinic, *see Reyes v. Wyeth Laboratories*, 498 F.2d 1264 (5th Cir. 1974), or even by a private doctor in a facility much like a small county health clinic. *See Givens v. Lederle*, 556 F.2d 1341 (5th Cir. 1977).

■ The exception established for the polio cases is quite narrow and highly fact specific. Unlike the polio cases, this case does not concern a massive, nationwide immunization program in which it would have been foreseeable by Parke-Davis that large numbers of flu vaccines would be dispensed without a physician's consideration of individual needs and circumstances.[6] The encounter in this case, moreover, was between a patient and a physician whom she had previously visited on three occasions, and not between an anonymous member of the public and an equally anonymous dispenser of the medicine. The facts of this case thus do not suggest that Parke-Davis had the duty to warn the public of the risks associated with Fluogen. We therefore must reject this theory of Parke-Davis' duty and remain committed to our conclusion that Mrs. Stanback failed to present evidence that Parke-Davis' failure to warn her physician caused her injury.

## IV.

We are mindful of the tragic human dimensions of this case, but we are persuaded that Mrs. Stanback cannot recover from Parke-Davis unless we hold it to a standard of absolute liability, and this we cannot do under Virginia law. *See Turner v. Manning, Maxwell & Moore, Inc.*, 216 Va. 245, 217 S.E.2d 863 (1975) (manufacturer is not an insurer of its product). Mrs. Stanback's inability to show that Parke-Davis' failure to warn physicians of the alleged risk of

GBS associated with its product Fluogen was the cause in fact of her injury leads us therefore to affirm the grant of summary judgment to Parke-Davis.

*AFFIRMED.*

---

6. Dr. Edmunds' admission that he administered over 1,000 flu shots a year does not undermine our analysis; that, standing alone, does not suggest a deliberate program of national immunization against the flu in 1976.