Rose, C. J.,
concurring:
I concur with the results of the majority opinion, but reach my conclusion on the viability of Allison’s claims against Merck on a different basis. I would adopt comment k of the Restatement (Second) of Torts § 402A (1965), but conclude that there remains a triable issue of fact concerning whether an adequate warning was given.
The dissenting opinion concludes that there is no issue of fact because Merck has established two viable defenses to the claim of failure to warn: that the government had contractually assumed the duty to warn and the government contractor defense. Admittedly, there is authority that relieves a drug manufacturer of the duty to warn by obligating the purchaser to give the warning. See Walker v. Merck and Company, 648 F. Supp. 931 (M.D. Ga. 1986), aff’d, 831 F.2d 1069 (11th Cir. 1987); Boruski v. United States, 803 F.2d 1421 (7th Cir. 1986). However, I believe the better view is to hold that the manufacturer of a drug should not be able to delegate this critical task to a third person — especially when it has reason to believe that the third party has an incentive or mind-set to underwarn about the drug’s potential dangers. See Petty v. U.S., 740 F.2d 1428 (8th Cir. 1984).
Additionally, I reject the assertion that the government contractor defense shields Merck from liability. The government contractor defense began with construction contractors and was extended by several courts to provide a defense for military contractors in military equipment design defect cases. McKay v. Rockwell Int’l Corp., 704 F.2d 444, 448 (9th Cir. 1983), cert. *783 denied, 464 U.S. 1043 (1984). The defense has been further extended to non-military contractors in design defect cases. Carley v. Wheeled Coach, 991 F.2d 1117 (3d Cir. 1993); Boruski v. United States, 803 F.2d 1421 (7th Cir. 1986).
As the dissent points out, most cases applying the government contractor defense have involved public works projects or military procurement contracts where the government was involved in either dictating or approving specific plans or designs. The rationale for the defense is to shield contractors from liability for product design defects where the government played a fairly significant role in its design. The reason for establishing such a defense is much less compelling when companies do not design and manufacture a product pursuant to government specification, as in the instant case. Therefore, I favor rejecting the defense when drug companies contract with the government. See Chapman v. Westinghouse Elec. Corp., 911 F.2d 267, 271-72 (9th Cir. 1990) (holding that in the absence of evidence that the government “provided or approved design specifications as to the design or manufacture” of the product, the government contractor defense could not be invoked); Nielson v. George Diamond Vogel Paint Co., 892 F.2d 1450, 1455 (9th Cir. 1990) (holding that the defense does not broadly immunize contractors from their own negligence and applying state tort law in the absence of a significant conflict with federal policy).
Once we conclude that Merck was responsible for providing an adequate warning, we must review the facts to see if Allision has presented a viable factual issue. I believe she has. The Important Information sheet reads: “Although experts are not sure, it seems that about 1 out of a million children who get measles or mumps vaccines may have a more serious reaction, such as inflammation of the brain (encephalitis).” Allison’s experts, however, presented information and opinions that the incidence of adverse reactions was considerably higher, at least 4.5 per million doses rather than 1 per million.
Additionally, a review of the entire fact sheet reveals that it is confusing and seems, at one point, to unreasonably understate the usually severe consequences of encephalitis. The Important Information sheet states that 1 in 20 children with natural mumps contracts a mild type of meningitis, and then goes on to state: “More rarely, it can cause . . . (encephalitis) which usually goes away without leaving permanent damage.” This statement, when read in conjunction with the statement that possibly 1 out of a million children will suffer encephalitis as a result of the vaccine, may mislead the reader into thinking that encephalitis suffered as a result of the vaccine is temporary and not severe — a conclusion which this case proves is incorrect.
*784 Summary judgment is inappropriate when there is the slightest doubt of the material facts. Doud v. Las Vegas Hilton Corp., 109 Nev. 1096, 864 P.2d 796 (1993). I conclude that a factual issue was presented by Allision with regard to the adequacy of the warning contained in the Important Information sheet. Therefore, I concur with the remanding of this case for the trial of Allison’s claims against Merck.
Young, J., with whom Steffen, J., agrees, concurring in part and dissenting in part:
While I concur with Justice Springer’s opinion as to CCHD, I respectfully dissent from his opinion as to Merck. This court’s decisions must be guided not by emotion but by the law, no matter how troubling the facts. And yet, today’s decision seems to be directed by something other than our current law.
This case comes before us following an order granting summary judgment for Merck. Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, demonstrates that no genuine issue of material fact remains in dispute, and that the moving party is entitled to judgment as a matter of law. Caughlin Homeowners Ass’n v. Caughlin Club, 109 Nev. 264, 849 P.2d 310 (1993). On appeal, this court’s review of an order granting summary judgment is de novo. Walker v. American Bankers Ins., 108 Nev. 533, 836 P.2d 59 (1992).
While I recognize that de novo review is the standard, I am unable to discern any error on the part of the district court, either factually or legally, such that I would have come to a different conclusion. Accordingly, I am of the opinion that summary judgment was proper in this case in light of the lack of any disputed issues of material fact.
Initially, I note that Justice Springer’s opinion fails to include a full account of the relevant facts. Therefore, I will set forth the following facts which I feel are essential for a complete understanding and disposition of this case.

THE FACTS OF THE CASE

In December 1982, Dr. Del Potter informed Mrs. Allison that it was time to have her 17-month-old son Thomas vaccinated against measles, mumps and rubella. Mrs. Allison had previously consented to vaccinations for Thomas for polio, diphtheria, tetanus and pertussis. Dr. Potter prescribed the MMR II vaccination for Thomas and informed Mrs. Allison that either he or CCHD could administer it.
Dr. Potter was in possession of a detailed package insert from Merck regarding the MMR II vaccine and its possible side *785 effects.[1] In addition, Dr. Potter was aware of the statistical incidence of encephalitis from the MMR II vaccine. However, he *786 testified that he did not warn Mrs. Allison because he did not wish to alarm her and because the statistical occurrence of encephalitis was so low as to present a nearly negligible risk. He instructed Mrs. Allison to contact him should Thomas suffer any untoward symptoms following vaccination.
On December 28, 1982, Mrs. Allison took Thomas to CCHD to receive his free MMR II vaccination. Mrs. Allison was given an information sheet entitled “Important Information about Measles, Mumps, and Rubella, and Measles, Mumps, and Rubella Vaccines.” The information sheet stated that 1 out of 1,000 children with natural measles develops an inflammation of the brain (encephalitis), which can lead to convulsions, deafness, or mental retardation, and that 1 in 10,000 children with natural measles dies from the condition. The information sheet also stated that 1 in 20 children with natural mumps contracts a mild type of meningitis, and that “[m]ore rarely, it can cause . . . (encephalitis) which usually goes away without leaving permanent damage.” The information sheet also contained a paragraph which provided:
POSSIBLE SIDE EFFECTS FROM THE VACCINES:
About 1 out of 5 children will get a rash or slight fever 1 or 2 weeks after getting measles vaccine. Occasionally there is a mild swelling of the salivary glands after mumps vaccination. Although experts are not sure, it seems that about 1 out of a million children who get measles or mumps vaccines may have a more serious reaction, such as inflammation of the brain (encephalitis).
Two other pertinent paragraphs of the information sheet provided:
QUESTIONS: If you have any questions about measles, mumps or rubella vaccinations, please ask us now or call your doctor or health department before you sign this form. REACTIONS: If the person who received the vaccination gets sick and visits a doctor, hospital, or clinic in the 4 weeks after vaccination, please report it to:
CLARK COUNTY HEALTH DISTRICT, 338-1357[.]
Mrs. Allison authorized Thomas’ MMR II vaccination by signing the information sheet in a space provided after the following language: “I have read the information provided on this form. ... I have had a chance to ask questions which were answered to my satisfaction. I believe I understand the benefits and risks of measles, mumps and rubella vaccines. . . .” In addition, Mrs. Allison was given the opportunity to ask any questions about the dangers of the MMR II vaccine.
*787 Three days after receiving the MMR II vaccine, Thomas developed a temperature of 102 degrees. He later developed encephalitis which resulted in severe injuries. Mrs. Allison filed suit individually and in her capacity as natural parent and guardian of Thomas against Merck, Clark County and CCHD. Clark County was later dismissed.
Eventually, the district court orally ruled that it would grant summary judgment to both Merck and CCHD. After Mrs. Allison moved for reconsideration and a hearing was held, the court entered its order granting summary judgment to both Merck and CCHD. Specifically, the district court held the following as to Merck: (1) the federal government had assumed, under its contract with Merck, the duty to provide adequate warnings to vaccine recipients; (2) Merck was entitled to immunity from suit under the government contractor’s defense; and (3) the MMR II vaccine was an unavoidably unsafe product not subject to strict liability.

EVIDENCE SUPPORTING SUMMARY JUDGMENT

As to the district court’s initial order granting summary judgment, I note that the court found that there was no allegation that the MMR II vaccine was defectively manufactured. In addition, the court found that the Allisons’ expert, Dr. Geraghty, based his conclusions as to the incidence of encephalitis following receipt of the MMR II vaccine on discussions with unidentified persons who had done informal calculations. Specifically, the court found that the only competent statistical evidence provided to the court revealed that the incidence of serious reactions to MMR II was one in one million.
In addition, plaintiff’s co-counsel, David Greenhaw, claimed that he had reviewed thousands of CDC adverse reaction reports and had discovered that the MMR II vaccine had been associated with 125 serious reactions over a three and one-half year period. However, the court found that Greenhaw’s affidavit did not state how many such vaccinations had been administered during that time and thus presented no basis for contesting the accuracy of Merck’s warnings. I can find nothing in the record to refute the district court’s findings on this issue.
I also note that upon reconsideration of the initial order granting summary judgment, the Allisons presented a new affidavit from Dr. Geraghty as well as a letter from another expert, Dr. David Benjamin. However, the court found that this additional information, which was presented to bolster the Allisons’ claim that Merck had understated the risk, involved foreign studies of various vaccines utilizing differing viral strains in the manufacturing process. Specifically, the court found that the Allisons had *788 offered nothing which indicated that the figures in the important information sheet were inaccurate.
In granting summary judgment for Merck, the district court held that there were no material issues of disputed fact. In doing so, the court found that the Allisons had failed to present sufficient evidence to overcome a summary judgment challenge from Merck. I find nothing in the record to refute such a finding and accordingly would affirm the court’s order of summary judgment.

STRICT LIABILITY

Justice Springer writes that Merck may be liable under our strict liability case law for defective products. In order to establish strict liability, the plaintiff must first establish that there was a defect in the product. Shoshone Coca-Cola v. Dolinski, 82 Nev. 439, 443, 420 P.2d 855, 858 (1966). Therefore, it follows that the Allisons must show that there was a defect in the MMR II vaccine that Thomas received in order to establish strict liability on the part of Merck. However, Justice Springer’s opinion appears reminiscent not of strict liability, but rather res ipsa loquitur which provides that certain types of accidents do not occur in the absence of negligence. He holds that if Thomas can establish that he was injured by the vaccine, then ipso facto the vaccine is defective, and thus Merck may be held strictly liable. Therefore, according to Justice Springer, the only issue remaining is causation although he neglects to elaborate just how that causation may be shown. This is surely not strict liability in accordance with our guidelines set down in Shoshone Coca-Cola.
Justice Springer goes on to assume without explanation that the vaccine in question was somehow “malfunctioning.” While this may have been true, an injury alone is not sufficient to establish such a defect in the product for purposes of strict liability. Only when a defect in the vaccine is shown, causing it to be unreasonably dangerous, is Thomas then permitted to argue that the defect caused his injuries. This was not the case here. If we are to follow Shoshone Coca-Cola as Justice Springer says, we must not forget this essential step.

COMMENT k

Justice Springer expresses great disapproval of comment k of Section 402A of the Restatement (Second) of Torts (1965), holding that in this state a drug manufacturer will be held strictly liable for any injuries caused by the drug even if the drug is “‘properly prepared and marketed’ and even when the known danger inherent in the drug may be what the comment calls ‘reasonable.’” I fear that the result of this holding will be that *789 this state will never allow a drug company to benefit from the protections of this comment. While I agree that comment k should not provide blanket protection to all drug manufacturers of any FDA approved drugs,[2]1 am of the opinion that those manufacturers of drugs that are clearly useful and desirable should be afforded such protection. Accordingly, I believe that a better way is to apply a balancing test weighing the benefits of the particular drug against the risks inherent in the use of the drug. See Toner v. Lederle Laboratories, 732 P.2d 297, 308 (Idaho 1987) (“The products comment k shields cannot be designed to be more safe at the time of distribution, but bestow benefits which clearly appear at the time of distribution to outweigh their concomitant risks.”); Castrignano v. E.R. Squibb & Sons, 546 A.2d 775 (R.I. 1988). It is clear that the benefits of the MMR II vaccine far outweigh the risks.
According to Health and Human Services Secretary Donna Shalala, more turkeys, chickens and household pets are immunized in this country than preschool children. Donna E. Shalala, Secretary of Health and Human Services, Make Each Week Immunization Week, Chi. Trib., April 26, 1994, at 20. Due to this recent decrease in immunization, outbreaks of diseases long thought to be eradicated, such as measles, polio and whooping cough, are increasing at an alarming rate. Between 1989 and 1991, a measles epidemic left 132 people dead and 11,000 hospitalized, many of them under the age of two. Id. The only method of protection from these highly contagious and sometimes fatal childhood diseases is the widespread use of vaccines. And yet, few pharmaceutical manufacturers are willing to produce vaccines due to the increasing risk of litigation. I fear a decision such as the court is making today will only serve to further inhibit the development and production of such life-saving vaccines.
The record includes a recommendation of the CDC’s Immunization Practices Advisory Committee regarding measles prevention. Recommendation of the Immunization Practices Advisory Committee (ACIP), Measles Prevention, Morbidity and Mortality Weekly Report, May 7, 1982, at 217-31. The article states that encephalitis occurred in approximately 1 out of every 2,000 cases of natural measles, often resulting in permanent brain damage and mental retardation, and death is said to have resulted in 1 out of every 3,000 measles cases. The article further states that prior to the introduction of the measles vaccine, 400,000 measles cases were reported every year. Since licensure of the vaccine in 1963, *790 there has been a ninety-nine percent reduction in the reported incidence of measles. The article also states that with 131 million doses of measles vaccine distributed throughout the United States through 1981, encephalitis and encephalopathy were reported approximately once per million doses. Finally the article claims that “[t]he incidence rate of encephalitis or encephalopathy following measles vaccine is lower than the observed incidence of encephalitis of unknown etiology, suggesting that some or most of the reported severe neurological disorders may be only temporally related to measles vaccination rather than due to vaccination.” Id. at 221.
Given the figures derived by the CDC as of May 1982, there is little question that the vaccine at issue has produced a major benefit for the majority of this country’s population. At the same time, the incidence of adverse reactions resulting in serious injuries is very rare. Such information illustrates that this is an unavoidably unsafe and yet not unreasonably dangerous drug. Accordingly, the MMR II vaccine is extremely beneficial and thus its manufacturer deserves comment k protection from strict liability.
The purpose of comment k is to provide protection for manufacturers of products that are unavoidably unsafe. As the comment mentions, vaccines which can be made no safer are the best examples of such products whose benefits outweigh their risks. Companies whose vaccines are recognized to be highly beneficial but which can be made no safer should be given the protection provided by comment k. To do so would not be such an affront to our system of products liability law as Justice Springer opines, but rather a wise and logical extension of that law.
Mazur v. Merck & Co., Inc., 964 F.2d 1348, 1353 (3d Cir.), cert. denied, ...... .U.S., ...... 113 S. Ct. 463 (1992), a case cited but distinguished by Justice Springer is factually remarkably similar to the case at bar. Mazur involved a child who received the very same MMR II vaccine in the same year as Thomas. The vaccine administered in Mazur was part of the same contract between CDC and Merck as the vaccine in this case. In addition, that vaccine was administered at a time when the same Important Information Sheet was being given to the parents of all children being vaccinated with MMR II as was given to Mrs. Allison. When the Mazur child suffered subacute sclerosing panencepha-litis (SSPE) following the vaccination, the Mazurs filed an action against Merck alleging negligence and strict liability for failure to provide an adequate warning.
The Mazur court held that if a product is unavoidably unsafe but not unreasonably dangerous under comment k, the strict liability principles in Section 402A do not apply. The court held *791 that under such circumstances, the drug company’s duty to warn is analyzed under Section 388. Id. at 1354. Section 388 provides that the supplier of a chattel is liable if it fails to exercise reasonable care to inform the user of the chattel’s dangerous condition or of the facts which make it likely to be dangerous.
As can be seen in Mazur, the use of comment k and the duty to warn are intrinsically linked. As I have stated, I believe comment k should apply in this case. However, whether Merck is provided with protection depends upon whether it fulfilled its duty to sufficiently warn the Allisons of the potential dangers of the MMR II vaccine.

DUTY TO WARN

Justice Springer asserts that the faulty warning aspect of liability in this case is that no prospective vaccinees were warned of the actual possibility of permanent brain damage. While Mrs. Allison was not warned that her son might become an invalid, she was warned by the CDC information sheet of the possible side effects of the vaccines. However, I question Justice Springer’s assertions. At what point is the line to be drawn? Must a manufacturer who has properly prepared the product warn of every possible side effect, no matter how infinitesimal the possibility? How vast must the warnings be? I am of the opinion that a reasonableness standard should apply, and I conclude that Merck’s warnings were reasonable in this case in light of the state of medical knowledge in 1982.
The Mazur court came to this same conclusion regarding Merck’s fulfillment of its duty to warn. Again, Mazur involved the very same vaccine as the one Thomas received. There, the United States Court of Appeals for the Third Circuit concluded that based upon the state of medical knowledge at the time the vaccine was received in 1982, the warnings provided by Merck were adequate. Mazur, 964 F.2d at 1367. Specifically, the court found that Merck had adequately informed the CDC of the facts which make the MMR II vaccine dangerous. Id.
As the court found in Reyes v. Wyeth Laboratories, 498 F.2d 1264, 1275 (5th Cir. 1974), failure to properly warn will render a product unreasonably dangerous under the Restatement. However, Reyes, the case upon which Justice Springer relies, is factually different from the instant case. Reyes involved a child who developed polio after receiving a Sabin oral polio vaccine in 1970. The child’s mother had apparently been given no warnings as to the possibility of her child contracting polio after receiving the vaccine. The Reyes court held that the vaccine manufacturer had a duty to warn of possible side effects of the drug, a duty it had failed to fulfill. Id. at 1279. However, the court noted that *792 while the danger of contracting polio from the vaccine was small, “the risk appealed] to be distributed evenly among that substantial segment of the population that is not naturally immune to polio.” Id. Clearly, there was a far greater risk of harm from the polio vaccine than from the MMR II vaccine. Therefore, the standard in Reyes is not applicable here, particularly in light of the warnings Merck provided to the CDC.
In the instant case, Mrs. Allison received warnings of possible side effects from the CDC, not Merck. Hence, the relevant inquiry is whether Merck provided the CDC with all possible data and whether Merck acted reasonably in contracting with the CDC to provide warnings to all vaccine recipients.

CONTRACTUAL DELEGATION OF THE DUTY TO WARN

Justice Springer states that a manufacturer cannot be relieved of ultimate responsibility for assuring that its product is dispensed with a proper warning. I agree. However, I believe that a manufacturer must be judged using a reasonableness standard as to whether it reasonably relied on the ultimate dispenser of the drug to warn recipients. Accordingly, the issue in this case is whether Merck reasonably relied upon the CDC to provide adequate warnings to the recipients of the MMR II vaccine.
Merck points out that the Important Information sheet given to Mrs. Allison was prepared by the CDC in conjunction with the CDC’s Immunization Practices Advisory Committee. Merck maintains that since the CDC possessed the most comprehensive information on the subject, having monitored over 131 million measles vaccinations from 1963 to 1981, Merck can hardly be considered unreasonable in having relied upon the CDC to formulate the Important Information sheet.
I am inclined to agree with Merck. The contract provision at issue provided in part:

DUTY TO WARN:

A. The Department of Health, Education, and Welfare, Public Health Service, Center for Disease Control, represents and agrees that it will (1) take all appropriate steps to assure that all vaccine supplied . . . pursuant to the terms of this contract, shall be administered to each patient on the basis of an individualized medical judgment by a physician, or (2) take all appropriate steps to provide to such patient (or the patient’s parent or guardian) meaningful warnings relating to the risks and benefits of vaccination, in form and language understandable to such patient, parent, or guardian.
*793 It was not merely Merck’s decision to have the CDC provide the warning that Mrs. Allison ultimately received. Retired CDC physician Harold B. Dull stated in his affidavit that the CDC requires state health departments to use the CDC’s Important Information Sheet whenever federally funded vaccines are administered. The MMR II vaccine that Thomas received was administered at no charge by CCHD under a program funded by state and federal grants. Dull stated that this requirement has been in effect since 1976 due to CDC concerns that vaccine manufacturers would overwarn potential vaccinees and thus discourage the use of vaccines.
In Boruski v. United States, 803 F.2d 1421, 1429 (7th Cir. 1986), the court held that because the government had contractually agreed with Merck to take all appropriate steps to provide vaccinees with meaningful warnings as to the risks associated with swine flu vaccine, the duty to warn had been assumed by the government and “Merck [had] the benefit of this additional defense.” However, this finding was mentioned in dicta. The court had already ruled that the duty to warn rested with the government pursuant to § 317(j)(l)(F) of the Swine Flu Act. Id. In a similar case, a federal court in Georgia ruled that the manufacturer of a polio vaccine, Merck, could fulfill its duty to warn by “‘obligating the purchaser [of the drug] to give warning.’” Walker v. Merck and Company, 648 F. Supp. 931, 935 (M.D. Ga. 1986), aff’d, 831 F.2d 1069 (11th Cir. 1987) (quoting Reyes v. Wyeth Laboratories, 498 F.2d 1264, 1276 (5th Cir. 1974)). Reyes borrowed this language from what it termed the leading federal case in the area, Davis v. Wyeth Laboratories, 399 F.2d 121 (9th Cir. 1968), cert. denied, 419 U.S. 1096 (1974). In Davis, the court ruled that Wyeth Laboratories had failed to adequately warn of the newly-discovered risks associated with the Sabin oral polio vaccine. The court held that “it is the responsibility of the manufacturer to see that warnings reach the consumer, either by giving warning itself or obligating the purchaser to give warning.” Davis, 399 F.2d at 131.
The Mazur court also followed this reasoning in affirming summary judgment in favor of defendant Merck. There, the court held that a manufacturer may be relieved of its duty to warn provided that it gave the CDC all relevant information and in no way misinformed the CDC. Mazur, 964 F.2d at 1368. The court concluded as a matter of law that Merck acted reasonably in relying on the CDC to issue proper warnings, noting that Merck had carefully researched the CDC before agreeing to sell the MMR II vaccine, as well as monitored the CDC’s performance after it made its decision to rely on the CDC. Id.
*794 In view of the foregoing authorities, which all involved failure to warn claims, it is clear that a pharmaceutical manufacturer may fulfill its duty to warn the ultimate consumer by obligating the purchaser of the vaccine to warn. Therefore, Merck could fulfill this duty by obligating the CDC to give warnings to recipients of the MMR II vaccine.
Merck contends that at the time Thomas was vaccinated, it had apprised the Food and Drug Administration (FDA) and the CDC of all adverse reaction reports which it had received associated with the MMR II vaccine. I find nothing in the record to refute this contention. The CDC monitors the use of vaccines on a nationwide basis and has the most comprehensive and up-to-date information regarding adverse reactions. Therefore, I must conclude that Merck did not act unreasonably in relying on the CDC to formulate a proper warning for all recipients of the MMR II vaccine.

LEARNED INTERMEDIARY DEFENSE

An additional reason why the district court did not err in granting summary judgment to Merck may be found in the learned intermediary defense. This defense is one that this court has never addressed. A learned intermediary was defined in Reyes as a medical expert, such as a prescribing physician, whose task is to weigh the benefits of any medication against possible dangers and to make “an individualized medical judgment bottomed on a knowledge of both patient and palliative.” Reyes, 498 F.2d at 1276. The pharmaceutical company’s duty, in selling prescription drugs, is to warn “only the prescribing physician, who acts as a ‘learned intermediary’ between manufacturer and consumer.” Id.
One exception to this doctrine is what is referred to as the “mass immunization” exception. This exception applies when a vaccine is administered at clinics without a physician. In such cases, it is the duty of the manufacturer to warn the consumer. Reyes, 498 F.2d at 1276; see also Davis, 399 F.2d at 131.
In Stanback v. Parke, Davis and Co., 657 F.2d 642 (4th Cir. 1981), the recipient of an influenza vaccine contracted Guillain-Barre Syndrome as a result of the vaccine. The physician had not received the manufacturer’s package insert with the vaccine, nor did the package insert warn of the risk of Guillain-Barre Syndrome associated with the vaccine. However, the physician testified that he was aware of the risk, but that it was not his practice to warn patients of the risks associated with the influenza vaccine. Consequently, the patient received no warnings prior to receiving the vaccine. The court concluded that even if the manufacturer *795 had sufficiently warned the physician, the patient would not have received the warning. Id. at 645. The court held that the physician’s “decisions and actions — made in full knowledge of the information which an adequate warning would have contained— therefore insulate Parke, Davis from any liability resulting from its failure to warn.” Id.
In the instant case, Dr. Potter advised Mrs. Allison that her son needed to be vaccinated against measles, mumps and rubella. He then prescribed the MMR II vaccine. He was in possession of the package insert provided by Merck containing information regarding adverse reactions. Yet, Dr. Potter failed to provide Mrs. Allison with any information or warnings regarding the possibility of side effects such as encephalitis. Had Mrs. Allison chosen not to go to CCHD for the vaccination, Dr. Potter, in all probability, would have administered the MMR II vaccine. Therefore, I must conclude that Dr. Potter, as the prescribing physician, was a learned intermediary in this case, one to whom Merck had a duty to warn of possible adverse reactions of the MMR II vaccine. Merck fulfilled this duty by providing prescribing physicians with the package insert containing all relevant information regarding adverse reactions. While Thomas received the vaccination at CCHD, it was Dr. Potter who, without warning Mrs. Allison, prescribed the vaccination based upon his medical knowledge. Merck should not be held liable simply because the learned intermediary failed to perform his duty to warn his patient. Stanback, 657 F.2d at 645.

GOVERNMENT CONTRACTOR DEFENSE

The United States Supreme Court has held that a manufacturer who contracts to produce a product for the federal government qualifies for the government contractor defense if it shows (1) the federal government approved reasonably precise specifications for the product; (2) the product conformed to those specifications; and (3) the manufacturer warned the government of any dangers of the product known to the manufacturer but not the government. Boyle v. United Technologies Corp., 487 U.S. 500, 513 (1988). In his opinion, Justice Springer holds that this defense is inapplicable to non-military contractors. However, I see no reason to exclude such contractors from this defense.
As Merck points out, the defense appears to have originated in Yearsley v. Ross Constr. Co., 309 U.S. 18 (1940), where the Supreme Court held that respondent could not be held liable for taking petitioners’ land since respondent had been widening the Missouri River pursuant to a contract with, and under the direction of, the United States government as authorized by an act of *796 Congress. The United States Court of Appeals for the Ninth Circuit later cited Yearsley as the grandfather of the defense and stated that “while the government contractor defense covered at first only construction projects, it has been recently applied by several courts to military equipment design defect cases.” McKay v. Rockwell Int’l Corp., 704 F.2d 444, 448 (9th Cir. 1983), cert. denied, 464 U.S. 1043 (1984).
The United States Court of Appeals for the Third Circuit recently held that the government contractor defense applies outside the military context. Carley v. Wheeled Coach, 991 F.2d 1117 (3d Cir.), cert. denied, ..... U.S., ...... 114 S. Ct. 191 (1993). Carley involved a medic who was injured when a government ambulance rolled over. Id. at 1118. Though the court found a material question of fact as to whether the manufacturer had sufficiently warned the government of the ambulance’s dangers, it stated that “the government performs a discretionary function when it procures a nonmilitary product with an awareness of its dangers. Therefore, it is clear that the government contractor defense is available to nonmilitary contractors.” Id. at 1123.
Thus, while many if not most of the cases dealing with this defense involve military contracts, including the United States Supreme Court’s decision in Boyle, I conclude that it also applies outside the military context. As the Boruski court stated, in deeming the defense applicable in a case involving a government contract for the swine flu vaccine,
[bjoth the history of the defense and its general rationale lead us to the conclusion that it would be illogical to limit the availability of the defense solely to ‘military’ contractors. If a contractor has acted in the sovereign’s stead and can prove the elements of the defense, then he should not be denied the extension of sovereign immunity that is the government contract defense.
Boruski, 803 F.2d at 1430 (citing Burgess v. Colorado Serum Co., 772 F.2d 844 (11th Cir. 1985)).
Mrs. Allison argues that if this court deems the government contractor defense applicable, Merck has failed to show that the government established “reasonably precise standards.” She maintains that while the FDA standards relating to the manufacture, testing, and licensure of the MMR II vaccine “may seem impressive to laymen, there is no showing that the standards are greater than those normally attendant to vaccine development,” and that Merck “should not be able to avail [itself] of the protections of the defense merely because they have complied with the industry standard.”
*797 Merck maintains that the “reasonably precise specifications” requirement was met because “every ‘design feature’ relating to MMR II is indisputably ‘considered by a government officer, and not merely the contractor itself.’ ” This argument was sufficient to satisfy the court in Boruski, 803 F.2d at 1430. Most cases applying the government contractor defense have involved public works projects or military procurement contracts where the government was involved in either dictating or approving specific plans or designs. The rationale for the defense is to shield contractors from liability for product design defects where the government played a fairly significant role in the design.
For example, in Boyle, a helicopter escape hatch was designed to open outward. When the helicopter crashed at sea, the water pressure prevented the hatch from opening and the co-pilot drowned. Plaintiffs contended the death could have been avoided had the hatch opened inward. The United States Supreme Court held the manufacturer not liable, since it had a “duty to manufacture and deliver helicopters with the sort of escape-hatch mechanism shown by the specifications.” Boyle, 487 U.S. at 509. Although there is no indication in the opinion that the Marine Corps thought about the escape-hatch design, the opinion suggests that by approving the specifications, the Marine Corps “considered” the design and thus the defense applied. Boyle, 487 U.S. at 509, 511.
Applying this analysis to the instant case, it is clear that the government considered the design features of the MMR II vaccine before approving its use on a nationwide basis. Accordingly, all the requirements for the use of the defense have been satisfied. Boyle, 487 U.S. at 513. In view of the increasing number of nonmilitary contracts entered into by the United States with nonmilitary contractors, it seems a very antiquated idea to limit the government contractor’s defense to the military. I can see no manifest difference between a military and a nonmilitary contract. Accordingly, I would affirm the district court’s holding that the government contractor’s defense shielded Merck in this case.

CONCLUSION

This is a tragic case. A young boy has been left in a grievous condition while his mother has been left to suffer her child’s pain on a daily basis. Though Thomas and Mrs. Allison are receiving Social Security, Medicaid and Aid to Dependent Children benefits, their lives surely cannot be easy.
And yet, however heartbreaking the facts, we cannot forget the law. Our job is to interpret the law as it applies to each case. *798 However tragic the case may be, we cannot bend or change the law simply to achieve results.
As Cardozo once wrote, we should strive for certainty in our law that will keep it “consistent with verities and principles as broad as the common law itself, and as deep and fundamental as the postulates of justice.” Benjamin N. Cardozo, The Growth of the Law 17 (1924). I fear that the court’s decision today strays from the certainty of our law to an inconsistent end.

 The MMR II package insert contained the following information regarding adverse reactions:
Because of the slightly acidic pH (6.2-6.6) of the vaccine, patients may complain of burning and/or stinging of short duration at the injection site.
The adverse clinical reactions associated with the use of M-M-R II are those expected to follow administration of the monovalent vaccines given separately. These may include malaise, sore throat, headache, fever, and rash; mild local reactions such as erythema, induration, tenderness and regional lymphadenopathy; parotitis, orchitis, thrombo-cytopenia, and purpura; allergic reactions such as wheal and flare at the injection site or urticaria, and arthritis, arthralgia and polyneuritis.
Moderate fever [101-102.9?F (38.3-39.4°C)] occurs occasionally, and high fever [above 103°F (39.4°C)] occurs less commonly. On rare occasions, children developing fever may exhibit febrile convulsions. Rash occurs infrequently and is usually minimal, but rarely may be generalized.
Clinical experience with live attenuated measles, mumps and rubella virus vaccines given individually indicates that encephalitis and other nervous system reactions have occurred very rarely. These might also occur with M-M-R II.
Experience from more than 80 million doses of all live measles vaccines given in the U.S. through 1975 indicates that significant central nervous system reactions such as encephalitis and encephalopathy, occurring within 30 days after vaccination, have been temporally associated with measles vaccine approximately once for every million doses. In no case has it been shown that reactions were actually caused by vaccine. The Center for Disease Control has pointed out that “a certain number of cases of encephalitis may be expected to occur in a large childhood population in a defined period of time even when no vaccines are administered.” However, the data suggests the possibility that some of these cases may'have been caused by measles vaccines. The risk of such serious neurological disorders following live measles virus vaccine administration remains far less than that for encephalitis and encephalopathy with natural measles (one per two thousand reported cases).
There have been isolated reports of ocular palsies and Guillain-Barre syndrome occurring after immunization with vaccines containing live attenuated measles virus. The ocular palsies have occurred approximately 3-24 days following vaccination. No definite causal relationship has been established between either of these events and vaccination.
There have been reports of subacute sclerosing panencephalitis (SSPE) in children who did not have a history of natural measles but did receive measles vaccine. Some of these cases may have resulted from unrecognized measles in the first year of life or possibly from the measles vaccination. Based on estimated nationwide measles vaccine distribution, the association of SSPE cases to measles vaccination is about one case per million vaccine doses distributed. This is far less than the association with natural measles, 5-10 cases of SSPE per million cases of measles. The results of a retrospective case-controlled study conducted by the Center for Disease Control suggest that the overall effect of measles vaccine has been to protect against SSPE by preventing measles with its inherent higher risk of SSPE.

 Some courts have chosen to provide blanket protection for drug manufacturers for any drug which has received FDA approval. See, e.g., Grundberg v. Upjohn Co., 813 P.2d 89 (Utah 1991).