35 F.3d 556
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Robert P. KLING, Plaintiff-Appellant,
v.
KEY PHARMACEUTICALS, INCORPORATED, Defendant-Appellee,
and Schering Plough Corporation; Schering Corporation, Defendants.
 No. 93-1827.
 United States Court of Appeals, Fourth Circuit.
 Argued June 8, 1994.
Decided Sept. 6, 1994.
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. T.S. Ellis, III, District Judge. (CA-92-1740-A)
 Philip Samuel Shaw, Rafferty, Polich & Shaw, Cambridge, Mass., for appellant.
 Michael James Garnier, Garnier & Garnier, P.C., Falls Church, Va., for appellee.
 On Brief: Edson H. Rafferty, Rafferty, Polich & SHAW, Cambridge, Mass., for appellant.
 E.D.Va.
 AFFIRMED.
 Before ERVIN, Chief Judge, and NIEMEYER and WILLIAMS, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 Robert P. Kling, M.D., filed this diversity action against Key Pharmaceuticals, Inc.* to recover damages allegedly resulting from his taking the prescription drug Theo-Dur, which is manufactured by Key Pharmaceuticals. Theo-Dur, a bronchodilator, is a time-release preparation of theophylline commonly prescribed for the treatment and control of asthma.
 
 
 2
 For several years before 1988, Kling suffered from asthma, sometimes characterized as "very severe." His condition was treated by Dr. Marvin Bloom, an allergist, who prescribed Theo-Dur and who monitored Kling's blood level. Kling, an ophthalmologist, participated actively in decisions relating to his treatment and assisted in obtaining blood tests under his own orders and in monitoring the effects of Theo-Dur. Kling also read materials about Theo-Dur, including the Physician's Desk Reference and the drug package insert. From time to time Kling wrote his own prescriptions for Theo-Dur, but on each such occasion, he testified, he did so only with the advice and consultation of Dr.Bloom. As the district court observed, Dr.Bloom was the prescribing physician.
 
 
 3
 One of the well-known side effects of Theo-Dur, noted in the Physician's Desk Reference and in the package inserts, is a sudden onset of violent seizures if blood levels of theophylline rise above the therapeutic level (10-20 micrograms per milliliter) and into the toxic range. The toxic level of the drug is very close to the therapeutic range, and as a result, most patients have their levels of theophylline monitored regularly to ensure that their theophylline levels remain between 10 and 20 micrograms per milliliter. Kling's theophylline blood levels were monitored by Dr.Bloom on a more frequent basis than the minimum recommended.
 
 
 4
 During the night of October 9, 1988, Kling suffered a seizure which jolted him out of bed. He fell to the floor, dislocating both shoulders and fracturing his left shoulder and two vertebrae. Kling was permanently disabled as a result of the injuries.
 
 
 5
 After the incident Kling researched the side effects of Theo-Dur and concluded that on October 9 he had suffered a seizure caused by a toxic level of theophylline. There is, however, no evidence of the level of theophylline in Kling's blood at the time of the incident on October 9. Based on his conclusion regarding the cause of his seizure, Kling believed that the drug manufacturer, Key Pharmaceuticals, had failed adequately to warn of the danger that even a therapeutic blood level of theophylline might lead to seizures in older males such as himself. At the time of the incident, he was 62. He also believed that the drug manufacturer had failed to warn of dose-to-dose variability known as "dumping" which often occurs in time-released medications such as Theo-Dur, which might lead to a toxic-level "spike" in theophylline blood concentration in an otherwise therapeutically-medicated patient. Again, no evidence was presented that any Theo-Dur taken or prescribed for Kling varied from dose-to-dose. Kling continued to take Theo-Dur after the October 9 incident for a short period of time.
 
 
 6
 In 1992, Kling sued Key Pharmaceuticals for negligence in testing, manufacturing, and marketing Theo-Dur, and for unreasonable failure adequately to warn of the drug's side effects, and a jury trial commenced in April 1993. At the trial, Kling produced two experts who testified that in their opinions his seizure had been caused by theophylline, and that the drug manufacturer's warnings inadequately alerted prescribing doctors to the risk of such seizures. While Dr.Bloom did not testify at trial, his deposition testimony did not establish that stricter warnings would have made any difference in his decision to prescribe the drug. Kling, however, testified that if he had been given the more detailed warnings about seizures that he thought were appropriate, he would not have taken Theo-Dur.
 
 
 7
 At the close of Kling's case, Key Pharmaceuticals moved for judgment as a matter of law under Fed.R.Civ.P. 50, contending that the plaintiff had failed to establish the inadequacy of warnings and to prove causation. The district court agreed with these arguments and granted the Rule 50 motion. Addressing each of Kling's contentions with respect to the inadequacy of the warnings in turn, the district court concluded that the warnings actually given in the Physician's Desk Reference and in the package insert addressed each risk identified and provided "a reasonable warning" as a matter of law. In addition to concluding that the warnings were adequate as a matter of law, the district court also rested its decision on Kling's failure to prove causation. The court pointed out that the record was devoid of any evidence that Dr.Bloom, the prescribing physician and the learned intermediary to whom the duty of warning was owed under Virginia law, would have considered any of the alleged defects in the warning to be material. Even assuming that Kling himself was a learned intermediary to whom a duty of warning was owed, the court concluded that the record was deficient as to what Kling thought was material. As the court said on this point:
 
 
 8
 All [Kling] says is if he'd known all the things in the literature--and he made this very thorough literature search--then he wouldn't have used it. He wouldn't have used Theo-Dur.
 
 
 9
 That in the court's view does not create a triable issue of fact on whether there was any materiality or proximate cause if he was the prescribing physician.
 
 
 10
 This appeal followed from entry of judgment in favor of Key Pharmaceuticals.
 
 
 11
 Under well-established Virginia law, a prescription drug manufacturer owes the consumer the duty of warning only the consumer's physician, or other person authorized to prescribe drugs, of risks or contra-indications associated with a drug. See Stanback v. Parke, Davis & Co., 657 F.2d 642 (4th Cir.1981). The warning that the manufacturer must give to the "learned intermediary" must be reasonable, but "not the best possible warning". See Pfizer, Inc. v. Jones, 272 S.E.2d 43, 45 (Va.1980).
 
 
 12
 Applying these principles to the record that was before the district court, we conclude that the district court did not err in entering judgment as a matter of law at the end of the plaintiff's case. The precise harm alleged to be suffered by Kling, a seizure, was clearly listed as a potential side effect of taking Theo-Dur. Moreover, the warning alerts the physician of special care that is to be given to elderly persons and warns that seizures may occur even at therapeutic levels of the drug. It also warns of the adverse effects of interfering with the time-release aspects of the medication. On these points, the Physician's Desk Reference states about Theo-Dur:
 
 
 13
 [S]erious side effects such as ventricular arrhythmias, convulsions or even death may appear as the first sign of toxicity without any previous warning. Stated differently, serious toxicity is not reliably preceded by less severe side effects.
 
 
 14
 * * *
 
 
 15
 Use with caution in patients with severe cardiac disease, severe hypoxemia, ... in the elderly (especially males)....
 
 
 16
 * * *
 
 
 17
 * * *
 
 
 18
 The physician should reinforce the importance of taking only the prescribed dose and time interval between doses. THEO-DUR tablets should not be chewed or crushed. When dosing THEO-DUR on a once daily basis, tablets should be taken whole and not split.
 
 
 19
 * * *
 
 
 20
 For most patients, effective use of theophylline, i.e. associated with optimal likelihood of benefit combined with minimal risk of toxicity, is considered to occur when the serum levels are maintained between 10 and 20 mcg/ml. Levels above 20 mcg/ml may produce toxicity, and in a small number of patients, toxicity may even be seen with serum levels between 15-20 mcg/ml, particularly during initiation of therapy.
 
 
 21
 Each of the deficiencies identified by plaintiff's experts is addressed in these excerpts and is also repeated on the package inserts.
 
 
 22
 We also conclude that the district court did not err in finding an absence of proof of causation. The prescribing physician, Dr.Bloom, provided no evidence that more explicit warnings would have altered his treatment plan. He was familiar with Theo-Dur and had prescribed it frequently. While we are not persuaded that Kling was a learned intermediary so as to be owed a duty to warn under Virginia law, we are nevertheless satisfied that he, too, has failed to show that any fact material to the circumstances of his case was not disclosed in the literature. He has not identified any fact, learned in his independent research, which was not reasonably disclosed by Key Pharmaceuticals and that would have caused him to alter his decision to use Theo-Dur.
 
 
 23
 Accordingly, we affirm the judgment of the district court.
 
 AFFIRMED
 
 
 *
 The complaint also named Schering-Plough, Inc., as a defendant, but he voluntarily dismissed that party at the beginning of trial